**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* FRANK TRA, Plaintiff, | ) | Case No. 14-2249-JWB-KGG |
| v. | ) | |
| DR. MARK R. FESEN and HUTCHINSON CLINIC, P.A., Defendants. | ) | |

**DEFENDANT HUTCHINSON CLINIC, P.A.'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS**

Pursuant to Fed. R. Civ. P. 8, 9, and 12(b)(6), Defendant Hutchinson Clinic, P.A. ("the Clinic") submits this memorandum in support of its Motion to Dismiss, which seeks dismissal of the Government's Complaint-In-Intervention (Doc. 25). At bottom, this case is about a dispute between medical-care providers over patient care—specifically, whether a physician's use of Rituxan, a chemotherapy drug, for maintenance purposes and/or for longer than two years constitutes unnecessary medical treatment merely because such uses are allegedly not in-line with medical compendia guidelines. Dr. Mark Fesen, the provider in question, is a former oncologist at the Clinic and is a Medicare provider. (*Id.*, ¶¶ 67 & 68). As a Medicare provider, Dr. Fesen agreed to submit to Medicare, through its Medicare Administrative Contractor ("MAC"), Wisconsin Physician Services Insurance Corporation ("WPS"), only those claims that were for medically necessary services. (*Id.*, ¶¶ 32, 39-47). Simply submitting a claim to WPS, though, does not guarantee payment; no, WPS must process the claim and determine if payment is warranted. (*Id.*, ¶¶ 32 & 35). Here, despite not alleging that any of Dr. Fesen's claims ever misrepresented the type of treatment that Dr. Fesen provided, or that WPS was unaware of Dr. Fesen's use of Rituxan

allegedly not being in-line with medical compendia guidelines, the Government nevertheless contends that FCA liability should attach because the claims submitted for Dr. Fesen's Rituxan treatment certified compliance with the compendia. As shown below, there are a myriad of problems with the Government's theory that warrant dismissal of every count in the Complaint-In-Intervention. As a result, the Clinic respectfully requests that its motion to dismiss be granted.

## I. Factual Background and Procedural History[1]

Leading up to 2007, Dr. Mark Fesen had been practicing as an oncologist at the Clinic for approximately fifteen years without significant issue. (Doc. 25, ¶ 67). In 2007, however, the Clinic hired a professional oncology pharmacist with a Doctor of Pharmacy, Frank Tra, Pharm.D., to serve as the pharmacist for its oncology practice, (*id.*, ¶ 2), a practice that consisted of only two physicians and sixty support personnel, (*id.*, ¶ 66). Shortly after arriving, Tra began focusing on Dr. Fesen's treatment plan and came to believe that something was amiss, namely, that Dr. Fesen was providing his patients with unnecessary treatment. (*See, e.g.*, *id.*, ¶¶ 74-76 & 79). In early 2009, Tra brought his concerns to the Clinic's then-CFO, Mike Harms, who promptly relayed Tra's concerns to the Clinic's Board of Directors. (*Id.*, ¶ 86).

### *The Clinic's initial response to Tra's concerns*

Following Harms' meeting with Tra, the Clinic and its management discussed Tra's concerns throughout 2009 and fielded whatever new ones that Tra raised. (Doc. 25, ¶¶ 87-91). At approximately the same time, the Clinic's MAC, WPS, developed and issued a new Local Coverage Determination ("LCD"), LCD L28576, which was entitled "Chemotherapy Drugs and their Adjuncts." An LCD, "is a determination by a Medicare Administrative Contractor (MAC)

---

[1] There are numerous factual allegations in the Complaint-In-Intervention with which the Clinic takes umbrage. In light of the standard applicable to motions to dismiss and for purposes of this motion only, however, the Clinic takes as true the Government's allegations set forth in the Complaint-In-Intervention.

respecting whether or not a particular item or service is covered on a contractor-wide basis . . . ." Medicare Program Integrity Manual, revised Feb. 12, 2019, ch. 13, § 13.1.1, *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/pim83c13.pdf.[2]

To ensure that Dr. Fesen's care was consistent with Medicare's standards, in October 2009 the Clinic issued Dr. Fesen a mandate directing him to be compliant with the recently published Medicare rules. (Doc. 25, ¶ 92). Additionally, in late 2009 the Clinic "restrict[ed] the use of chemotherapy drugs to those that were approved for use by Medicare," (*id.*, ¶ 96), which effectively put Tra in charge of Dr. Fesen's compliance with Medicare standards.

On its own accord, the Clinic also hired Dr. Roger Gingrich, a professor at the University Iowa College of Medicine, to review the Clinic's oncology practice in June 2010. (Doc 25, ¶ 98). For his review, Dr. Gingrich was provided with ten patient charts—five from Dr. Fesen and five from the Clinic's other oncologist. (*Id.*, ¶ 99). According to the Government, the selection of these ten Medicare patients was "random." (*Id.*, ¶ 99 & 102). For each of Dr. Fesen's patients, Dr. Gingrich concluded that the treatment provided was "inappropriate and not in compliance with compendia guidelines." (*Id.*, ¶ 101). In fact, for one of the patients, who had been given Rituxan for maintenance purposes for six years, Dr. Gingrich stated that the use of Rituxan was "unbelievable," (*id.*, ¶ 104), presumably because Dr. Gingrich believes that "current data supports" only two years of maintenance and "do[es] not support extended therapy," (*id.*, ¶ 117).

Four days after receiving Dr. Gingrich's findings, the Clinic's Administrative Council held a meeting to review them. (Doc. 25, ¶ 108). Ultimately, it was decided that Dr. Gingrich should perform a larger review consisting of fifty-nine of Dr. Fesen's charts and sixteen of the Clinic's

2 The Court may consider the CMS Medical Program Integrity Manual without converting the Clinic's motion to dismiss into a motion for summary judgment. *See, e.g.*, *United States ex rel. Modglin v. DJO Global Inc.*, 48 F. Supp. 3d 1362, 1372 n.26 (C.D. Cal. 2014) (considering the Program Integrity Manual at the motion to dismiss stage).

other oncologist, which Gingrich did on or about September 29, 2010. (*Id.*, ¶ 110). Of the fifty-nine Dr. Fesen charts he reviewed, Dr. Gingrich concluded that thirty involved patients who had "received chemotherapy regimens that were not evidence-based or in line with compendia guidelines" (*id.*, ¶ 112), that eleven involved patients receiving smaller than the standard dosage for longer intervals (*id.*, ¶ 113), and that six records were "so poorly documented 'that a clear indication of clinical intent or direction could not be discerned'" (*id.*, ¶ 114). The Government does not allege, however, how Dr. Fesen's charts were selected, random or by some other means.

After he had completed his second review, Dr. Gingrich met with the Clinic's Board of Directors and presented his findings. (Doc. 25, ¶ 126). According to Dr. Gingrich, Dr. Fesen was "ignoring national consensus practice guidelines for treating cancer patients." (*Id.*, ¶ 130). A few days after meeting with Dr. Gingrich, the Clinic's Administrative Council met with Dr. Fesen to discuss Dr. Gingrich's findings. (*Id.*, ¶ 129). Dr. Fesen objected to the findings and the basis on which they were reached, namely, the "evidence-based medicine" approach, an approach based on empirical data, not necessarily the particularities of a specific patient. (*Id.*, ¶ 129). Despite his objections, Dr. Fesen agreed to "comply with some of the Board's mandates regarding his use of chemotherapy." (*Id.*, ¶ 131). In addition to its new mandates, the Clinic also sent Dr. Fesen to a refresher course on hematological diseases, formally gave Tra oversight over Dr. Fesen's chemotherapy regimens, and stated that Dr. Gingrich was to be consulted if a disagreement over treatment ever arose between Tra and Dr. Fesen. (*Id.*, ¶ 133).

***Tra's oversight of Dr. Fesen's practice***

Throughout 2010 and 2011, Tra "reviewed Dr. Fesen's regimens on a daily basis." (Doc. 25, ¶ 137). As part of his review, Tra compared Dr. Fesen's initial diagnoses and prescribed treatment plans against the compendia guidelines. (*Id.*, ¶¶ 134-35). If a particular treatment plan

"wasn't in line with applicable guidelines, Tra [had the explicit authority to] deny the treatment or offer an appropriate compendia-listed regimen." (*Id.*, ¶ 135). During this time, Tra apparently was "in near-constant contact" with the Clinic's then-CFO, Mike Harms. (*Id.*, ¶ 139). According to Tra, he "consistently" caught Dr. Fesen trying to skirt the guidelines—*e.g.*, giving Rituxan maintenance beyond two years, but was able to "correct[]" his attempts. (*Id.*, ¶ 138). Despite Tra's authority, and the fact that there is no allegation that anyone in Clinic leadership ever tried to thwart it, the Government now claims that there are "several" examples of Dr. Fesen disregarding Tra's oversight and/or the "binding decision" of Dr. Gingrich. (*Id.*, ¶¶ 143-45). It is unclear, though, how Dr. Fesen received unnecessary chemotherapy drugs if Tra, the oncology practice's pharmacist and the one who had veto power over Dr. Fesen's treatment plans, did not approve.

It appears that it is the Government's position that Dr. Fesen, unbeknownst to the Clinic, was somehow going "around the approval of the oncology pharmacist [*i.e.*, Tra]" and "administering [drugs] against the policy of the Board." (Doc. 25, ¶ 146). In support of this theory, the Government cites the fact that the Clinic took the extraordinary step of fining Dr. Fesen $10,000 in December 2010. (*Id.*, ¶ 146). While the Government states that the fine was for Dr. Fesen's alleged "misuse" of the chemotherapy drug Navelbine, (*id.*), other than saying that Dr. Fesen did not follow the established approval process, the Government does not provide any information regarding why the administration of Navelbine was improper or whether any claim for such use was ever submitted to Medicare for payment.

***The Clinic's final actions with respect to Dr. Fesen***

In April 2011, the Clinic, again on its own accord, engaged Dr. Gingrich to review its oncology practice. This time, Dr. Gingrich looked through fifty patient charts—forty-nine of which belonged to Dr. Fesen and one that belonged to the Clinic's other oncologist. (Doc. 25, ¶ 154). The

Government does not state how the charts were selected, random or by some other means. Although the bottom-line number is not provided, it appears that Dr. Gingrich disagreed with at least a portion of Dr. Fesen's treatment plans set forth in the reviewed charts. (*See id.*, ¶¶ 156-59).

Following Dr. Gingrich's third review, on May 24, 2011, the Clinic's Administrative Council prepared a summary of talking points, which included the following points: (1) Dr. Fesen's "clinical practice is not consistent with acceptable oncologic standards"; and (2) Dr. Fesen's practice is putting the Clinic at risk for "billing and medical necessity issues." (Doc. 25, ¶ 160). One month later, Dr. Gingrich apparently told the Clinic that he couldn't "help but surmise there [wa]s a bit of deviousness in [Dr. Fesen's] method as opposed to well-grounded smarts and common sense." (*Id.*, ¶ 161). At some point in mid- to late-2011, the Clinic and Dr. Fesen began negotiating Dr. Fesen's resignation from the Clinic, which they successfully did, resulting in Dr. Fesen's termination as of December 31, 2011. While the Government alludes to there being multiple reasons for the parties' parting of ways, it specifically alleges that one of the reasons was Dr. Fesen's "significant reluctance . . . to follow Medicare guidelines as it relates to the chemotherapy treatment of patients." (*Id.*, ¶ 163).

Approximately six months after Dr. Fesen left the Clinic, the United States Attorney's Office for the District of Kansas ("USAO") contacted the Clinic. Specifically, on or about June 20, 2012, a subpoena duces tecum was served on the Clinic. (*See Subpoena Duces Tecum*, attached hereto as Ex. 1).[3] This subpoena made fifteen different requests—all of which related to Dr. Fesen and/or the Clinic's oncology practice and went back to January 2008. (*See generally id.*).

---

[3] It is proper for this Court to consider the subpoena without converting the Clinic's motion to dismiss into a motion for summary judgment because the subpoena is a matter that is subject to judicial notice under Federal Rule of Evidence 201. *See, e.g.*, *Garrett v. Comcast Commc'ns*, No. 04-0693, 2004 WL 2624679, at *2 (N.D. Tex. Nov. 17, 2004) (taking judicial notice of a subpoena at the motion to dismiss stage); *see also Salazar v. City of Albuquerque*, No. 10-0645, 2013 WL 5554185, at *30 (D.N.M. Aug. 20, 2013) ("When ruling on a motion to dismiss, the Court

In total, between 2008 and 2011, 289,407 claims were submitted to Medicare for treatment provided by Dr. Fesen. (Doc. 25, ¶ 229). 10,743 claims were submitted to Tricare/Champus for treatment provided by Dr. Fesen (*Id.*, ¶ 230). Medicare paid the Clinic over $30 million for the treatment of its beneficiaries, (*id.*, ¶ 229), while Tricare/Champus paid $545,938.61, (*id.*, ¶ 230). Although the Government alleges that some private insurers had rejected Dr. Fesen claims, (*id.*, ¶ 141), it makes no mention of Medicare, Tricare, or WPS denying any of the claims submitted for treatment administered by Dr. Fesen. Additionally, despite the number of claims that were made and the amount of money that was paid, the Government does not allege that Medicare, Tricare, or WPS ever alleged that any of Dr. Fesen's treatments was medically unnecessary and tried to recoup any of the money that had been paid to the Clinic. Nevertheless, the Government now claims that "perhaps as much as half, if not more" of Dr. Fesen's claims to Medicare and Tricare/Champus during the time in question were false. (*Id.*, ¶ 234).

***Tra files a lawsuit against Dr. Fesen and the Clinic asserting FCA violations***

On May 28, 2014, Tra filed an FCA relator action under seal. (Doc. 1).[4] The Complaint named Dr. Fesen and the Clinic as defendants and asserted four FCA claims: (1) presentment of a false claim in violation of 31 U.S.C. § 3729(a)(1)(A); (2) making of a false statement in support of a false claim in violation of 31 U.S.C. § 3729(a)(1)(B); (3) knowingly avoiding an obligation to repay the Government in violation of 31 U.S.C. § 3729(a)(1)(G); and (4) conspiring to commit an FCA violation in violation of 31 U.S.C § 3729(a)(1)(C). (*Id.*, ¶ 106). According to Tra, his FCA claims arose out of three schemes to defraud: (1) misdiagnosing and overtreating patients, (2)

---

may take judicial notice of facts that are 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned . . . without converting the motion into one for summary judgment.'").

[4] It is proper for the Court to consider its own record in this case without converting the Clinic's motion. *See, e.g., Miles v. Kan.*, No. 11-4180, 2012 WL 3442413, at *1 n.3 (D. Kan. Aug. 15, 2012).

Rituxan dosage fraud, and (3) fractionation of medication prescribed. (*Id.*, ¶¶ 67-109). Tra filed the First Amended Complaint under seal on September 24, 2014, which was substantially similar to the Complaint except that it added a fourth alleged scheme to defraud: multiple use of single-dose vials of Neupogen. (Doc. 5, ¶¶ 104-31).

Approximately nine-months later, on June 30, 2015, the United States Department of Justice ("DOJ"), through the USAO, issued a Civil Investigative Demand ("CID") to the Clinic, which made twelve different requests for documentary materials and propounded seven written interrogatories. (*See generally* CID, attached hereto as Ex. 2). All of the requests and interrogatories related to Dr. Fesen and/or the Clinic's oncology practice and asked for responsive documents or answers going back to January 2008. (*Id.*). On or about the same time that the aforementioned CID was issued, the DOJ issued a second CID requesting oral testimony from three Clinic employees. (Second CID, attached hereto as Ex. 3). The second CID indicated that the employees would be asked about Dr. Fesen and/or the Clinic's oncology practice. (*Id.*).

On July 26, 2018, the Government filed a notice of election to intervene in part and to decline to intervene in part. (*See* Doc. 23). As stated in the notice, the Government was only intervening "in the part of the action which allege[d] that defendants Dr. Mark Fesen and Hutchinson Clinic submitted claims to government insurers for cancer treatments that were false because they were medically unnecessary." (*Id.*). The Government's notice requested that the Complaint, the First Amended Complaint, the notice, and the order on the notice be unsealed, but that the rest of the docket not be. (*Id.*). Three days later, the Court granted the Government's request, and, for the first time, the Clinic saw the allegations lodged against it. (Doc. 24).

On October 26, 2018, over six years after it had served the subpoena duces tecum on the Clinic, the Government filed its Complaint-In-Intervention, which asserted five counts: (1) false

claim; (2) false record; (3) reverse false claim; (4) unjust enrichment; and (5) mistake of payment. (Doc. 25). Unlike the Complaint and First Amended Complaint, the Complaint-In-Intervention did not allege conspiracy. However, the Complaint-In-Intervention did add that the Clinic could be held liable for the alleged counts based on Dr. Fesen's treatment under the principles of respondeat superior and vicarious liability. (*Id.*, ¶ 18). Consistent with its notice to intervene in part, the Government based each of its counts solely on the notion that Dr. Fesen and the Clinic had received money to which they were not entitled because such payments were based on claims relating to cancer treatments that were not medically necessary. (*Id.*, ¶¶ 238, 243, 252 & 256).

Despite the Complaint-In-Intervention having 258 paragraphs, only ten of them actually attempted to identify any of the approximately 300,000 claims that were allegedly submitted to WPS: paragraphs 173, 180, 187, 192, 196, 201, 206, 214, 222, and 223. While these ten paragraphs set forth the date of service, the code for treatment, a description of treatment, and the amount paid, they did not include what the identified claims listed as Dr. Fesen's basis for treatment, which the underlying CMS Form 1500 would have had as it is required for WPS to make a determination on whether to pay a particular claim. (*See* CMS Form 1500 (08/05), attached hereto as Ex. 4).[5]

## II. STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6), a claim must be plausible, which means that it must contain enough factual content to enable the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When deciding a motion to dismiss, the Court must accept the complaint's well-pleaded allegations as true and construe them in the light most favorable to the plaintiff. *See*

---

[5] In February 2012, CMS Form 1500 (08-05) was revised by Form 1500 (02-12). *See* Details for Title: CMS 1500, *available at* https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/CMS-Forms-Items/CMS1188854.html?DLPage=1&DLEntries=10&DLFilter=1500&DLSort=0&DLSortDir=ascending. This revision does not affect this case as all of the alleged conduct occurred prior to the revision.

*Robbins v. Wilkie*, 300 F.3d 1208, 1210 (10th Cir. 2002). However, conclusory allegations are not entitled to be presumed true. *Iqbal*, 556 U.S. at 681. Furthermore, for claims based on fraud, a plaintiff must also plead with the level of specificity required by Fed. R. Civ. P. 9(b). *See United States ex rel. Polukoff v. St. Mark's Hosp.*, 895 F.3d 730, 745 (10th Cir. 2018). At bottom, a plaintiff's well-pleaded allegations must raise the right to relief above the speculative level to meet the threshold pleading standard. *See, e.g.*, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

## III. ARGUMENT

The Government does not plausibly plead an FCA or common law claim against the Clinic. Regarding the FCA counts (Counts I, II, and III), they fail for the following reasons: (1) Count I does not plausibly allege that the Clinic presented a materially false claim to the Government or had knowledge of a submitted claim's falsity; (2) Count II does not adequately identify a single false record that was made to support a false claim that was presented to the Government for payment or that the Clinic had knowledge of any record's falsity; and (3) Count III merely alleges that the Clinic failed to refund the money that the Government had paid to it based on the alleged false claims that had been submitted without adequately alleging that any misstatement was made in relation to this failure or that the money paid constituted an obligation. As for the two common law counts (Counts IV and V), they fail because they are based on quasi-contract theories when the Complaint-In-Intervention establishes that a valid contract existed between the parties. Accordingly, each one of the Complaint-In-Intervention's five counts should be dismissed.

What's more, the five counts should be dismissed with prejudice. We are now on the third iteration of a complaint against the Clinic. Importantly, this is not a case where the identified pleading deficiencies arise from the plaintiff's inability to obtain information within the defendant's exclusive control. No, far from it. Prior to filing the Complaint-In-Intervention, the

Government investigated this case for over six years. In light of the amount of time the Government has had, and the substantial discovery that it has received, there is no reason to believe there is anything else that the Government could plead in order to allege a plausible FCA or common law claim against the Clinic. Accordingly, all of the Complaint-In-Intervention's counts should be dismissed with prejudice. *See, e.g.*, *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006) ("A dismissal with prejudice is appropriate where a complaint fails to state a claim under Rule 12(b)(6) and granting leave to amend would be futile.").

**A. The FCA claims (Counts I, II, and III) fail to state a claim.**

Three FCA theories are asserted in this case: Count I, that the Clinic presented a false claim; Count II, that the Clinic made, used, or caused to be made a false record material to a false claim; and Count III, that the Clinic concealed or improperly avoided an obligation to pay the Government. Because each of these theories is based on fraud, the Government must comply with Rule 9, which is to say that it must "provide factual allegations regarding the who, what, when, where and how of the alleged claims [that underlie its FCA theories]." *Polukoff*, 895 F.3d at 745. Thus, it is not good enough that the Government merely plead some overarching fraud; rather, it must focus on the specific claims that were actually submitted. *See United States ex rel. Aflatooni v. Kitsap Physicians Serv.*, 314 F.3d 995, 1002 (9th Cir. 2002) ("The False Claims Act, then, focuses on the submission of a claim, and does not concern itself with whether or to what extent there exists a menacing underlying scheme."); *United States ex rel. Barko v. Halliburton Co.*, 241 F. Supp. 3d 37, 52 (D.D.C. 2017) ("In sum, [t]he FCA is not a catchall anti-fraud provision; it only goes after claims that are false, not claims that are submitted while fraud is afoot.").

Here, only ten of the Complaint-In-Intervention's 258 paragraphs come even close to satisfying Rule 9—paragraphs 173, 180, 187, 192, 196, 201, 206, 214, 222, and 223, as they are

the only ones providing some modicum of identifying information for a specific claim. With that said, even these ten paragraphs fall short of Rule 9's heightened pleading standard for one overarching reason: none of them says anything about what the submitted claim listed as the justification for the bill-for treatment, which is obviously critical when determining whether WPS was misled. Again, to have a viable FCA claim, the Government must base its claim on the submission of a false claim, not the alleged existence of an underlying fraud. Therefore, because the Government does not provide one example of what a presented claim listed as its treatment's justification, all of the Government's FCA theories should be dismissed on this additional ground.

Furthermore, to the extent the Government is relying on the paragraphs listed above to establish that "a significant portion—perhaps as much as half" of the 300,000 claims submitted were false, its effort should fail. Courts have stated that, generally speaking, "extrapolation is a reasonable method for determining the number of false claims *so long as the statistical methodology is appropriate*." *United States ex rel. Loughren v. UnumProvident Corp.*, 604 F. Supp. 2d 959, 261 (D. Mass. Feb. 24, 2009) (emphasis added). Here, however, nothing about the proposed extrapolation is appropriate. First, no statistical analysis is actually offered, despite the Government having the relevant evidence and six years to develop its case. Instead, the Government merely cites to the three audits that Dr. Gingrich performed—two of which were apparently not random and the third involved only five patients—and the administration of allegedly unnecessary Rituxan to nine patients, patients that could hardly be said to be representative of all of Dr Fesen's patients. Second, extrapolation is not proper in a case such as this where the theory of falsity hinges upon a "highly fact-intensive inquiry involving medical testimony after a thorough review of the detailed medical chart of each individual patient." *United States ex rel. Michaels v. Agape Senior Cmnty., Inc.*, No. 12-03466, 2015 WL 3903675, at *8

(D.S.C. June 25, 2015). Accordingly, the Government's FCA theories should be limited to just those claims that it has specifically identified and not those that it implies may exist.

The Government's pleading failures should not be excused. Unlike *qui tam* cases where intervention does not occur, here the complaint's pleading deficiencies cannot be attributed to "the plaintiff's inability to obtain information within the defendant's exclusive control." *Polukoff*, 895 F.3d at 745 (overlooking the plaintiff's failure to meet Rule 9 on this ground). As noted above, and is clear from the specific information given for Patients A through I (*see* Doc. 25, ¶¶ 169-224), substantial, if not complete, discovery has already occurred in this case. Furthermore, "[a]ttorneys from DOJ and the United States Attorney Offices have, under the memorandum of understanding, the same direct access to contractor data and records as OIG and the FBI." CMS Medicare Manual System, Pub. 100-8 Program Integrity, Ex. 1 – Definitions (Department of Justice), *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/Downloads/R47PI.pdf. Thus, there is no basis to ignore the pleading requirements in this case. With that said, even if the Court excuses the Government's failure to meet Rule 9's requirements, which it should not, the Government's FCA theories must be dismissed because they each fail for individual reasons.

**1. Count I does not plausibly allege *material* falsity or that the Clinic submitted any claim with knowledge that it was false.**

For FCA liability to attach, a presented claim must be false, the falsity must be material, and the party presenting the claim must know of its falsity. *See Polukoff*, 895 F.3d at 743. Under the FCA, there are two ways in which a claim can be false: it can be factually false or legally false. *Id.* at 741. "Factually false claims generally require a showing that the payee has submitted an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided." *Id.* (citation omitted). Legally false claims, "on the other hand, generally require knowingly false certification of compliance with a regulation or contractual provision as a

condition of payment." *Id.* (citation omitted). Although the false-claim provision of the FCA does not explicitly state that a claim's falsity must be material, the Supreme Court in *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2002-03 (2016), interpreted the provision as requiring it. While the precise contours of materiality may not be defined, the Supreme Court has stated the "materiality standard [is] demanding" and "rigorous" and subject to enforcement at the motion to dismiss stage. *Escobar*, 136 S. Ct. at 2003 & 2004 n.6.

**i. Material falsity is not adequately alleged.**

Here, the Government's false claim theory is based on legal falsity, as it does not allege that Dr. Fesen ever lied on a claim about the actual treatment that he provided, rather, it merely challenges the propriety of Dr. Fesen's treatment on the ground that it was unnecessary. *See Polukoff*, 895 F.3d at 741 (stating that the defendant's alleged failure to "comply with Medicare's reasonable and necessary requirement" constituted "*legally* false requests for payment" (emphasis in original)). As stated above, only ten paragraphs in the Complaint-In-Intervention provide any identifying information at all about a presented false claim—paragraphs: 173, 180, 187, 192, 196, 201, 206, 214, 222, and 223. As a result, the Court's review of Count I must center on these ten paragraphs and those paragraphs that are specifically offered in support of them—paragraphs 165 through 224—all of which relate to Dr. Fesen's administration of Rituxan.

In addition to the general reasons listed above as to why all of the FCA theories fail, Count I fails in particular because it does not plausibly allege material falsity. In the allegations offered in support of the ten paragraphs identifying specific claims, three reasons are advanced for why the identified claims are false, *i.e.*, not medically necessary: (1) Rituxan was not a "medically appropriate treatment" for the patient's disease, (Doc 25, ¶¶ 170, 186 & 198), (2) the use of Rituxan

for maintenance is not supported by the medical compendium, (*id.*, ¶¶ 178, 186, 189-90, 200 & 204-05); and (3) Rituxin was used beyond two years, (*id.*, ¶¶ 178, 186, 196, 205 & 209).

Starting with reason one, the Government has not adequately pled it. Specifically, the Government has offered no basis for this Court to believe that Rituxan was not an appropriate treatment for the identified patient's disease, as the relevant paragraphs merely state that Rituxan is inappropriate without providing the reason why. To be sure, there are allegations in the Complaint-In-Intervention that indicate that Rituxan is not appropriate for *all* types of lymphoma. However, the Government concedes, as it must, that, for *some*, it is. (Doc. 25, ¶¶ 118 & 120). Therefore, without the Government "provid[ing] . . . medical, technical, or scientific context" for its contention that Rituxan was not "medically appropriate" for the specific type of lymphoma that a claim for payment was based upon, the Court should not credit it. *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 779-80 (7th Cir. 2016) (refusing to credit allegations regarding medical necessity because the complaint provided no basis for them).

As for the Government's second and third reasons (Rituxan maintenance is not supported by the medical compendia nor is the use of Rituxan beyond two years), their basis—the compendia—is clearer than reason one's. Nonetheless, reasons two and three do not make Count I's claim viable because the Government does not plausibly allege that the lack of compendia support for Dr. Fesen's Rituxan treatment was material to WPS's payment. The Government's theory centers upon the belief that, consistent with LCD L28576, the medical compendia establish the baseline by which all care should be compared when determining its medical necessity. Therefore, whenever a provider submits a claim for payment for treatment that is not supported by the medical compendia, the provider has submitted a false claim because the claim for payment requires the provider to certify that the billed-for treatment is medically necessary.

The problem with this theory, at least with respect to materiality in a post-*Escobar* world, is that WPS, as Medicare's claims processor for Kansas, is charged with having knowledge of the Medicare standards applicable to its claims processing. *See, e.g.*, *United States v. Boynton*, 63 F.3d 337, 343-44 (4th Cir. 1995) (stating that "administrative bodies may be presumed [to know] the existing regulatory scheme"); *cf. Prime Care of NE Kan., LLC v. Humana Ins. Co.*, 447 F.3d 1284, 1287 (10th Cir. 2006) ("Congress is presumed to enact legislation with knowledge of the law . . . ."). Knowledge is critical because, as recognized in *Escobar*, "if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements [at issue] are not material." *Escobar*, 136 S. Ct. at 2003-04. Stated another way, "[a] misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment." *Id.*

Here, glaringly absent from Count I, as well as its supporting allegations, is any contention that WPS was unaware of Dr. Fesen's Rituxan treatment's alleged inconsistency with the medical compendia. As a Medicare contractor, WPS is charged with "[d]etermin[ing] if the items and services furnished are covered or otherwise reimbursable under title XVIII of the [Social Security] Act [and] [d]etermin[ing] any amounts payable and [to] make payment accordingly." 42 C.F.R. § 405.920. In making its determinations, WPS relies upon the information contained in the CMS Form 1500 that is presented, which lists, among other things, (1) the patient's name (Box 1), (2) the insured's i.d. number (Box 1.a), (3) the diagnosis or nature of illness or injury (Box 21), (4) dates of service (Box 24.A), (5) the procedures, services, or supplies (Box 24.D), (6) the diagnosis pointer (Box 24.E), (7) the amount of charges (Box 24.F), and (8) the billing provider's NPI. (*See* CMS Form 1500 (08/05), attached hereto as Ex. 4). In addition to the Form 1500 that is submitted

for a particular claim, WPS also has at its disposal Dr. Fesen's historical billing data (at least eighteen months' worth) as part of its data analysis program. *See* Medicare Program Integrity Manual, dated Nov. 22, 2000, Ch. 2, §§ 2 & 2.2, *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/Downloads/R3PIM.pdf. Thus, there is simply no plausible way to conclude that WPS was not aware of Dr. Fesen's Rituxan treatments' alleged failure to comply with the medical compendia guidelines, especially in light of the fact that the alleged failures were, according to the Complaint-in-Intervention, glaringly obvious.

Any claim that the CMS Form 1500 presented in this case did not provide sufficient information to impute knowledge to WPS rings hollow. First, the Government does not identify a single piece of information that a particular Form 1500 should have included but did not. Second, the Form 1500 is the form that CMS has deemed as sufficient to provide its contractors with enough information to make coverage determinations. If, for some reason it is not enough in a specific case, contractors may "request additional information," which has not been alleged here. *See* Medicare Program Integrity Manual, dated Nov. 22, 2000, Chapter 3 at § 5.3.3, *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/Downloads/R3PIM.pdf. Third, WPS's review is not limited just to the specific Form 1500 seeking payment. WPS has a robust data analysis program that has, at a minimum, at least eighteen months' worth of billing data for Dr. Fesen. Therefore, if the Government contends that it lacked knowledge of the alleged failures to meet medical compendia guidelines, such a contention should fall on deaf ears.

WPS's conduct during the time in question confirms that compliance of the compendia in all cases is not material. To begin with, the Government does not allege a single instance in which WPS, as opposed to a private carrier, denied a Rituxan claim. Even if it had, though, it is clear that WPS continued to pay Rituxan claims throughout the alleged timeframe, despite notice of non-

compliance. As recently noted by the Fifth Circuit, consistent and continuing payments strongly indicates that compliance with a particular regulatory requirement is not material. *See, e.g.*, *United States ex rel. Harman v. Trinity Indus. Inc.*, 872 F.3d 645, 663 (5th Cir. 2017) ("[C]ontinued payment by the federal government after it learns of the alleged fraud substantially increases the burden on the relator in establishing materiality."). Further pushing the plausibility bar to an unattainable height is the fact that the alleged violations of the compendia's requirements were obvious. For instance, the Complaint-In-Intervention states that Dr. Fesen prescribed Rituxan for years longer than the compendia allowed, (Doc. 25, ¶¶ 117, 122, 157, 176-78 & 184-86). Finally, when the alleged regulatory violation potentially risks life or limb, which the Complaint-In-Intervention implies is the case with regard to Rituxan, (*see id.*, ¶ 145 ("Prolonged Rituxan use had caused the patient numerous health problems.")), the Government's incentive to intervene if something material is actually awry is great. *See Harman*, 872 F.3d at 663. Accordingly, the Court should follow the Supreme Court's admonition and find the alleged non-compliance with the medical compendia guidelines not material in this case as a matter of law.

Neither Dr. Gingrich's belief that the treatment provided to a very small subset of Dr. Fesen's patients, which the Government has not claimed to be statistically significant, did not meet various compendia requirements nor the alleged fact that certain members of the Clinic had concerns about Dr. Fesen's practice should affect the outcome here. Simply put, "[t]he Medicare statute unambiguously vests final authority in the Secretary, and no one else, to determine whether a service is reasonable and necessary, and thus whether reimbursement should be made." *Bodnar v. Sec'y of Health & Human Servs.*, 903 F.2d 122, 125 (2d Cir. 1990). While the Secretary may delegate such authority to "Medicare contractors through regulations," *Hays v. Leavitt*, 583 F. Supp. 2d 62, 64 (D.D.C. 2008), claim determinations are not subject to endless challenge merely

because one or more providers disagree with another provider's treatment plan. The fact of the matter is that, despite knowing that Dr. Fesen was allegedly not complying with the compendia guidelines, WPS continued to pay claims. As that decision was WPS's to make, it should not be subject to revision nearly a decade later based simply on the disagreement of some medical personnel reviewing a small, statistically insignificant number of claims.

To be clear, it is not the Clinic's position that just because Medicare or one of its contractors pay a claim that such payment cannot be challenged and recouped at a later date. However, in order for that to occur, the Government must follow one of the prescribed ways for recouping an overpayment—administratively through the manner set forth in 42 C.F.R. §405.371(c), or through litigation by asserting a cause of action pursuant to 28 U.S.C. § 1345, which would have a six-year statute of limitations, *see* 28 U.S.C. § 2415(a), or the FCA, which would require a showing of falsity, materiality, and scienter. It cannot, as it has done here, create its own hybrid claim that is free from the requirements of the existing avenues of recourse and allows it to file suit nearly a decade after many of the claims in question were filed. Therefore, the Government's false claim theory (Count I) should be dismissed with prejudice for failure to state a claim.

**ii. The false claim theory also fails because the Government does not plausibly plead that the Clinic had knowledge of the falsity.**

The FCA's knowledge requirement can be satisfied by showing: (1) actual knowledge, (2) deliberate ignorance, or (3) reckless disregard of the truth or falsity of information. 31 U.S.C. § 3729(b)(1). Here, the Government does not actually allege the Clinic knew that Dr. Fesen was allegedly administering unnecessary Rituxan; rather, the Government attempts to establish knowledge in two alternative ways: first, by imputing Dr. Fesen's alleged knowledge to the Clinic through vicarious liability, respondent superior, and/or agency principles, and second, by relying on Dr. Gingrich's findings during his reviews. Neither basis is sufficient to establish knowledge.

Beginning with vicarious liability, respondent superior, and agency, they are misplaced principles in the context of this case. To be sure, there are a handful of courts that have allowed FCA liability to be imputed to an alleged bad actor's employer. That should not happen here because doing so would not only fail to further the primary purpose of vicarious liability—self-policing—it would actually be inconsistent with it. It cannot be lost the steps the Government itself alleges the Clinic took to prevent the actions that Dr. Fesen purportedly took. Throughout the alleged timeframe, the Clinic, which has over twenty-five practice specialties, had only two oncologists. There is no allegation that the Clinic had any suspicion that Dr. Fesen was engaging in Medicare fraud until Tra arrived. Furthermore, as alleged, once Tra arrived and notified the Clinic of his concerns, the Clinic took swift and decisive action. As alleged, the Clinic: (1) began by issuing Dr. Fesen a mandate directing him to be compliant with Medicare's recently adopted guidelines; (2) then restricted the use of chemotherapy drugs to those that were approved for use by Medicare; (3) later on, hired an outside consultant to review its oncology practice; (4) based on this review, requested that a larger study be performed; (5) when the new results came back, took a number of significant actions, such as establishing a protocol for Dr. Fesen's practice, sending Dr. Fesen to a refresher course, and, notably, giving Tra approval power over his treatment plans, which Tra apparently exercised dutifully; (6) when it learned on one occasion that Dr. Fesen had not followed its established protocol, levied a $10,000 fine against him; (7) requested that the outside consultant perform a third review; and (8) ultimately decided that it needed to part ways with Dr. Fesen, which it did. Thus, as alleged, this is not a case where an employer sat blissfully by allowing its employee to continue to flout the rules, and it should not be treated as such, especially in light of the "punitive [] nature" of the FCA as recognized fairly recently by the Supreme Court. *Vt. Agency of Nat. Res. v. United States ex rel. Stevens,* 529 U.S. 765, 784 (2000).

Additionally, it would be inappropriate to impute knowledge here because, to the extent Dr. Fesen administered unnecessary treatment, he did so outside of the confines established by the Clinic. Courts that have allowed FCA liability to be imputed have done so when the employee was "acting within the scope of his or her employment." *United States ex rel. Jones v. Brigham & Women's Hosp.*, 678 F.3d 72, 82 n.18 (1st Cir. 2012). As noted above, the Clinic had in place a specific protocol that called for Tra to review Dr. Fesen's treatment plans on a daily basis to ensure compliance with Medicare's guidelines, including medical necessity. Therefore, it necessarily follows that, if any of Dr. Fesen's billed-for treatments were unnecessary, it was because Dr. Fesen was somehow ignoring the Clinic's protocol, and, thus, acting outside the scope of his employment. As a consequence, Dr. Fesen's knowledge should not be attributed to the Clinic.

Likewise, Dr. Gingrich's findings should not be viewed as establishing knowledge. To begin with, according to the Complaint-In-Intervention, Dr. Gingrich did not find multiple instances of Rituxan being administered unnecessarily until the end of the September 2010, i.e., approximately the same time the last identified claim was submitted. (*See* Doc. 25, ¶ 173 (listing the last claim as being submitted around Oct. 11, 2010)). Furthermore, it is not plausible to believe that the Clinic was knowingly or recklessly submitting false claims because it had Tra, who was the person who apparently first raised general concerns regarding Dr. Fesen's practice, reviewing Dr. Fesen's treatment plans on a daily basis. Accordingly, knowledge is lacking here.

**2. Count II does not adequately plead a false records theory.**

There are two problems with Count II: first, the necessary linkage between any false record that Dr. Fesen purportedly made and a specific claim presented to the Government is missing, and second, it is not adequately alleged that the Clinic had knowledge of any record being false.

Contrary to the Government's intimation otherwise, it is not enough to allege that a person in the chain made a false record and money was received from the Government; rather, the complaint must "'link the alleged false statements to the government's decision to pay false claims.'" *United States ex rel. Vigil v. Nelnet, Inc.*, 639 F.3d 791, 800 (8th Cir. 2011) (quoting *Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318, 1330 (11th Cir. 2009)). Thus, in order to adequately plead a false record theory, a complaint must do two things: first, it must sufficiently identity a claim that was presented to the Government for payment; and second, it must link that claim to a specific misrepresentation that the defendant made. *See United States ex rel. Strubbe v. Crawford Cnty. Memorial Hosp.*, --- F.3d ----, 2019 WL 512190, at *4 (8th Cir. Feb. 11, 2019) (affirming dismissal where the complaint "fail[ed] to connect the false records or statements to any claim made to the government"); *accord United States ex rel. Ibanez v. Bristol-Myers Squibb Co.*, 874 F.3d 905, 916 (6th Cir. 2017) (upholding dismissal even though "relators allege defendants made false or fraudulent statements [because] there are no allegations connecting these statements to any claim made to the government"). The Complaint-In-Intervention misses the mark at both stages.

Beginning with the first step, the only claims for which the Government makes any effort to satisfy Rule 9 are found in the following paragraphs: 173, 180, 187, 192, 196, 201, 206, 214, 222, and 223. While the allegations relating to the claims identified in these paragraphs provide a service date, treatment code, short description of the drug/treatment administered, and the amount of the Government's payment, they are nevertheless deficient because they are incomplete. For the Government's false record theory, the most damning deficiency is the fact that the allegations provide no information regarding what diagnosis or explanation was listed on the presented claim to justify the payment that was sought. Because the Government is not claiming that Dr. Fesen did

not actually administer the drug/treatment listed in the claim, such information is needed for this Court to plausibly infer that the claims cited in the paragraphs listed above were actually false.

In addition to inadequately pleading a false claim, Count II is also deficient because it fails to identify and link any specific false statement or report that Dr. Fesen allegedly made to any of the claims listed in paragraphs 173, 180, 187, 192, 196, 201, 206, 214, 222, and 223. Rule 9(b)'s heightened pleading standard applies to theories asserted pursuant to § 3729(a)(1)(B), *see, e.g.*, *Olson v. Fairview Health Servs. of Minn.*, 831 F.3d 1063, 1072 (8th Cir. 2016), and, therefore, the Rule's "who, what, when where and how" requirement applies with equal to such theories, *see Polukoff*, 895 F.3d at 745. Unfortunately for the Government, the Complaint-In-Intervention makes no mention of a specific misrepresentation that Dr. Fesen made in connection with one of the claims listed in the paragraphs cited above. Accordingly, dismissal of the false statement theory asserted in Count II is warranted. *See, e.g.*, *United States ex rel. Benaissa v. Trinity Health*, No. 15-159, 2018 WL 6843624, at *12-13 (D.N.D. Dec. 31, 2018) (dismissing the § 3729(a)(1)(B) theory because it did "not plead the making of any 'false record or statement' with particularity").

Dismissal is also warranted on the ground that the Government does not adequately allege the Clinic knew of any record being false. As discussed above, knowledge should not be imputed to the Clinic nor should Dr. Gingrich's reviews be viewed as establishing it.

**3. Count III's reverse false claim theory fails on multiple levels.**

Count III asserts a reverse false claim theory against the Clinic based on its failure to return overpayments that it allegedly received between 2008 and 2011. Prior to May 20, 2009, the date the Fraud Enforcement and Recovery Act of 2009 ("FERA") was signed, in order to succeed on a reverse false claim theory, a plaintiff had to plead that the defendant had made, used, or caused to be made "'a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit

money or property to the Government." *United States ex rel. Barrick v. Parker-Migliorini Int'l, LLC*, 878 F.3d 1224, 1230 (10th Cir. 2017). However, following the passage of FERA, a plaintiff may also base their reverse false claim theory on a defendant's alleged knowing concealment or avoidance of an obligation to pay money to the Government. *Id.* Regardless of which route a plaintiff chooses, they must still allege the existence of an obligation. *Id.*

Here, the Government's reverse false claim theory is deficient for at least two reasons: (1) to the extent that the theory is based on alleged avoidance or concealment that occurred prior to May 20, 2009, it does not allege, as it must, that the Clinic made any false statements to the Government regarding such avoidance or concealment; and (2) it does not adequately allege the existence of an obligation arising from conduct occurring after May 20, 2009.

**i. Count III fails to allege any actionable conduct prior to May 20, 2009.**

As noted above, on May 20, 2009, FERA was enacted, which, among other things, substantially changed the reverse false claim theory by adding an alternative way for plaintiffs to prevail on such a theory—merely proving that avoidance or concealment occurred without also having to show that a misstatement was made in relation to it. However, "[t]he amendments made by [FERA took] effect on the date of enactment of th[e] Act and [only] apply to conduct on or after the date of enactment." FERA, PL 111-21, 123 Stat. 1617, § 4(f)(1). Therefore, because the Government does not allege that the Clinic made any statements to WPS intended to coverup the overpayments that it allegedly received, Count III should be dismissed to the extent that it relies on conduct that occurred prior to May 20, 2009. *See, e.g.*, *United States ex rel. Bahrani v. ConAgra, Inc.*, 624 F.3d 1275, 1302 n.14 (10th Cir. 2010).

**ii. Count III does not adequately allege the existence of an obligation from conduct that occurred on or after May 20, 2009.**

Generally speaking, in the run-of-the-mill FCA case, "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment" must be shown to establish the existence of an obligation. *Barrick*, 878 F.3d at 1230. The Tenth Circuit has interpreted this requirement to mean that, to create liability, a duty to pay "must be formally established at the time of the improper conduct, not dependent on a future discretionary act." *Id.* at 1232. In the Affordable Care Act of 2010 ("ACA"), Congress stated that an obligation may arise in the Medicare context when a defendant has received an overpayment, *i.e.*, money that "a person receives or retains to which the person, *after applicable reconciliation*, is not entitled under," and fails to return the overpayment within "60 days after the date on which the overpayment was *identified*." 42 U.S.C. § 1320a-7k(d)(2), (3) & (4) (emphasis added). Under either the ACA definition or the one applicable in the run-of-the-mill FCA case, the Government has failed to adequately allege the existence of an obligation.

Beginning with the ACA definition, it is of no help to the Government because there is no allegation stating that a reconciliation has occurred. *See United States ex rel. Martino-Fleming v. S. Bay Mental Health Center, Inc.*, No. 15-13065, 2018 WL 4539684, at *6 (D. Mass. Sept. 21, 2018) (dismissing the relator's reverse false claim theory because "there [wa]s no allegation that any such 'reconciliation' occurred, nor is it clear what that would look like given that the parties' entitlement vel non to Medicaid reimbursements is the subject of this very litigation").

Even if the Court were to overlook the reconciliation requirement, which it should not, the Government's reverse false claim theory should still be dismissed because the meaning of "identified" is ambiguous, as (1) the ACA does not define it and (2) the interpretative regulation

is not retroactive and is ultra vires, and therefore the term should be construed in the Clinic's favor. Starting with the ACA, it does not say how the term should be construed, despite the term being the operative provision for determining when an overpayment becomes an obligation. Additionally, the legislative history is muddled. The House of Representative's initial version of the ACA used the term "known," as opposed "identified," when stating when the 60-day clock started and stated that the FCA's definition of knowledge, which includes recklessness, should apply. H.R. 3200, Rep. No. 111-299, 2009 WL 3321420 § 1641 (2009). The House's initial version also named the subsection discussing overpayments and when they become obligations, "Reports on and Repayment of Overpayments Identified *Through Internal Audits and Reviews*," *id.* (emphasis added), as opposed to what the subsection was ultimately called, which is "Reporting and returning of overpayments," Pub. L. No. 111-148, 124 Stat. 119, § 1128j (2010). Apparently, there is no legislative history outlining why the switches occurred, but the fact that Congress ultimately opted against using a term that includes a standard less than actual knowledge (recklessness) and excised from the title of the relevant subsection the phrase "through internal audits and reviews" indicates that it intended for ACA's obligation definition to cover only those instances when a party had actual knowledge that an overpayment had in fact occurred. *See I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 442-43 (1987) ("Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language." (citation omitted)).

Admittedly, Congress could have intended for "identified" to have a meaning different than the one just proposed. With that said, a definition that is less stringent than the Clinic's should not be applied in light of the draconian consequences that flow from FCA liability—namely, civil penalties between $5,500 and $11,000 for each false claim and treble damages. As noted by the Supreme Court, the FCA's damages "are essentially punitive in nature," as they "reveal[] an intent

to punish past, and to deter future, unlawful conduct, not to ameliorate the liability of wrongdoers." *Stevens*, 529 U.S. at 784. In light of the FCA's punitive nature, statutory ambiguities must be resolved in the defendant's favor in order to avoid void-for-vagueness and lenity problems. *See, e.g.*, *United States ex rel. Holbrook v. Brink's Co.*, 336 F. Supp. 3d 860, 870-71 (S.D. Ohio 2018). Therefore, because the Government's allegations merely raise the inference that the Clinic *may have* had a basis to believe that overpayments had occurred, as opposed to showing that it in fact had *actual knowledge* that they had, the Government has failed to plead the existence of an obligation, and, thus, its reverse false claim must be dismissed.

42 C.F.R. § 401.305(a)(2) and its definition of "identify" is of no help to the Government. To begin with, the regulation became effective March 14, 2016. "Retroactivity is not favored in the law . . . [thus] administrative rules will not be construed to have retroactive effect unless their language requires this result." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). Here, no such language exists, therefore, the regulation should not apply to the conduct at issue here because it all occurred before 2016. Section 401.305 should also not be applied because it constitutes an abuse of CMS's rulemaking authority. Specifically, by allowing FCA liability to attach in situations where a person "should have through the exercise of reasonable diligence" learned of an obligation, a negligence standard, § 401.305 impermissibly expands liability beyond the bounds allowed for by the FCA. *See UnitedHealthcare Insur. Co. v. Azar*, 330 F. Supp. 3d 173, 190-91 (D.D.C. 2018) (refusing to enforce a similarly worded regulation applicable to Medicare Advantage organizations, 42 C.F.R. § 422.326(c), on this ground). Finally, § 401.305(a)(2) is infirm because "it is not a logical outgrowth of the agency's proposed regulation[]." *Id.* at 191. Most notably, the proposed regulation did not state that CMS was considering adopting a negligence standard for "identification." *See* 81 FR 7654-01, 2016 WL 538810, § 3 (admitting that

it had "revised the requirements for reporting and returning of overpayments [by] remov[ing] the terms 'actual knowledge,' 'reckless disregard,' and 'deliberate ignorance' [and replacing them with the phrase] when the person has or *should have through the exercise of reasonable diligence* determined that the person has received an overpayment" (emphasis added)). As recently shown by the District Court of the District of Columbia, this sort of administrative bait-and-switch cannot withstand scrutiny. *See Azar*, 330 F. Supp. 3d at 191-92.

Even if the Court were to find that the ACA's definition was expansive enough to cover cases where a defendant has less than actual knowledge, it should not apply that definition in this case because the ACA is unconstitutional. As recently found in *Texas v. United States*, 340 F. Supp. 3d 579 (N.D. Tex. 2018), the ACA's individual mandate, as amended by the Tax Cuts and Job Act of 2017, is no longer constitutional, as it no longer triggers a tax, which was the Supreme Court's sole basis for finding the mandate constitutional in *National Federal of Independent Business v. Sebelius*, 567 U.S. 519 (2012). Because the mandate is "so interwoven" with the rest of the ACA, there is no way to sever it from the rest of the ACA, and, thus, the ACA, as a whole, must fall. Although *Texas* involved a different ACA provision than the one in this case, its general findings—that the ACA is unconstitutional in its entirety—applies with equal force here. Accordingly, the Court should find § 1320a-7k's definition of obligation is of no effect.

Without the ACA's definition for obligation, the Court is left with the definition that applies in the run-of-the-mill FCA cases. Under this definition, courts have repeatedly dismissed reverse false claim theories that, like Count III here, merely regurgitate the same allegations that the false claim and false records counts did on the theory that to do otherwise "would mean that any time a defendant violated sub-sections (a)(1)(A) or (B) and received payment, the defendant would also necessarily violate sub-section (G) if it failed to repay to the Government the

fraudulently-obtained payments." *United States v. Mount Sinai Hosp.*, 256 F. Supp. 3d 443, 458 (S.D.N.Y. 2017); *accord United States ex rel. Myers v. Am's Disabled Homebound, Inc.*, No. 14-8525, 2018 WL 1427171, at *3 (N.D. Ill. Mar. 22, 2018); *United States, ex. Rel. Besancon v. Uchicago Argonne, LLC*, No. 12-7309, 2014 WL 4783056, at *4 (N.D. Ill. Sept. 24, 2014); *United States ex rel. Ruscher v. Omnicare, Inc.*, No. 08-3396, 2014 WL 2618158, at *28 (S.D. Tex. June 12, 2014). Stated differently, courts overwhelmingly have rejected the logic that "just about any traditional false statement or presentment action [sh]ould give rise to a reverse false action." *Pencheng Si*, 71 F. Supp. 3d at 97. This Court should do the same.

**B. The Common Law claims (Counts IV and V) fail to state a claim.**

The Government's common law claims should be dismissed because they are implausible. "[A] provider of services can participate in Medicare only if the provider files an agreement with the Secretary of Health and Human Services." *Barker v. Wash. Nat'l Ins. Co.*, No. 12-1901, 2013 WL 1767620, at *5 (D.S.D. Apr. 24, 2013) (citing 42 U.S.C. § 1395cc(a)(1)(A)). Thus, the alleged overpayments in this case undeniably spawn from an express contract. It is "well established . . . that there can be no claim for unjust enrichment [or payment by mistake] when an express contract exists between the parties." *United States ex rel. Shemesh v. CA, Inc.*, 89 F. Supp. 3d 67, 80 (D.D.C. 2015). Therefore, in order to plausibly plead a quasi-contract claim, such a claim "must be supported by, at the very least, an allegation that there is no valid contract." *United States v. Kellogg Brown & Root Servs., Inc.*, 800 F. Supp. 2d 143, 160 (D.D.C. 2011); *accord United States ex rel. Jackson v. Univ. of N. Tex.*, No. 13-734, 2015 WL 13744208, at *11 (E.D. Tex. Nov. 18, 2015); *United States v. Bollinger Shipyards, Inc.*, No. 12-920, 2013 WL 3984058, at *4 (E.D. La. Aug. 1, 2013) (same); *United States v. Univ. Health Servs., Inc.*, No. 07-00054, 2010 WL 2976080, at *2 (W.D. Va. July 28, 2010) (same); *United States v. Kaman Precision Prods., Inc.*, No. 09-

1911, 2010 WL 11626636, at *7 (M.D. Fla. Aug. 19, 2010) (same). Because the Government does not plausibly make such an allegation, Counts IV and V should be dismissed.

While it is true that Rule 8 does allow parties to plead in the alternative, the complaint must, at a minimum, provide a colorable basis to believe that a quasi-contract theory is possible. Here, that has not been done. As shown above, the Government has failed to adequately plead that it entered into any agreement with the Clinic based on a fraudulent misrepresentation. *See, e.g.*, *Kwang Dong Pharm. Co. v. Han*, 205 F. Supp. 2d 489, 497 (D. Md. 2002) (stating that, "[b]ecause the court ha[d] already determined that Han did not adequately plead fraud, there can be no fraud exception to the rule banning unjust enrichment claims"). Additionally, the Government makes no contention that the underlying agreement on which all of its payments were based is infirm in any way. *See, e.g.*, *United States ex rel. Reeves v. Mercer Transp. Co., Inc.*, 253 F. Supp. 3d 1242, 1256 (M.D. Ga. 2017) (rejecting the Government's argument that it could assert a quasi-contract claim because the complaint did "not allege that the contracts are invalid or potentially invalid").

## CONCLUSION

Despite having years to develop an actionable theory of liability against the Clinic based on Dr. Fesen's actions, the Government has failed to do so. The fundamental problem with the Government's lawsuit is that it is based upon a disagreement between medical providers over the propriety of one provider's care. While some medical professionals may disagree with the care administered by Dr. Fesen, the fact remains that there is nothing in the Complaint-In-Intervention that WPS did with respect to the challenged claims, despite having all of the information necessary to do so if it had wanted. Therefore, because WPS is the entity charged with deciding medical necessity, the Government's current allegations against the Clinic are misplaced and should be dismissed with prejudice. Accordingly, the Clinic's motion to dismiss should be granted.

Respectfully Submitted,

FOULSTON SIEFKIN LLP
1551 N. Waterfront Pkwy., Ste. 100
Wichita, KS 67206-4466

By: /s /Gary L. Ayers_
Gary L. Ayers, S. Ct. No. 10345
gayers@foulston.com
Dir. Tel.: 316.291.9530
Clayton J. Kaiser, S. Ct. No. 24066
ckaiser@foulston.com
Dir. Tel.: 316.291.9539

*Attorneys for Defendant Hutchinson Clinic, P.A.*

## CERTIFICATE OF SERVICE

I certify that on the 7th day of March, 2019, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send email notification of electronic filing to counsel for all parties of record.

/s/ Gary L. Ayers
Gary L. Ayers