IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,
ex rel. FRANK TRA,

Plaintiff,

v.

Case No. 14-02249-JWB-KGG

DR. MARK R. FESEN and
HUTCHINSON CLINIC, P.A.,

Defendants.

**UNITED STATES' CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS**

## NATURE OF THE ACTION

The United States intervened in this case to assert claims under the False Claims Act 31 U.S.C. § 3730(b)(4) ("the FCA"). This action alleges the submission of false claims to Medicare and Tricare for Defendant Fesen's administration of a drug used to accompany chemotherapy for cancer treatment when the claims falsely certified that the drug was medically necessary. The Complaint sets forth in detail allegations that the defendants violated the FCA by submitting or causing to be submitted false claims to Medicare and Tricare; for making or using false records or statements; and for improperly avoiding an obligation to pay the government. The Complaint also includes the common law causes of action of unjust enrichment and payment by mistake.

The Complaint sets forth the falsity and manner of the false claims, and contains specific examples of patients who received the drug, sometimes needlessly for many years, when it was not medically necessary for which the federal programs paid the false claims. It also describes in detail how defendant Hutchinson Clinic's internal audits showed that claims violated medical

standards, Medicare guidelines, and the clinic's own policies, but the clinic took no action to repay Medicare or Tricare.

Defendants move to dismiss all counts of the Complaint based on Fed. R. Civ. P. 8, 9(b), and 12(b)(6).[1] For the reasons discussed below, the Court should deny the defendants' motions.

## ARGUMENT

### I. Standards of Review

#### A. Fed. R. Civ. P. 12(b)(6)

In ruling on a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court assumes as true all well-pleaded facts in a complaint and views them in a light most favorable to plaintiff. *See Zinermon v. Burch*, 494 U.S. 113, 118 (1990); *Swanson v. Bixler*, 750 F.2d 810, 813 (10th Cir. 1984). The motion should be denied if a complaint contains "enough facts to state a claim to relief that is plausible on its face." *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Bell Atl. Corp v. Twombly,* 550 U.S. 544, 555, 570 (2007)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard reflects the requirement in [Fed. R. Civ. P.] 8 that pleadings provide defendants with fair notice of the nature of claims as well the grounds on which each claim rests." *United States ex rel. Feaster v. Dopps Chiropractic Clinic, LLC*, 2015 WL 6801829 *2 (D. Kan. 2015) (citing *Robbins v. Oklahoma*, 519 F.3d 1242, 1248 (10th Cir. 2008) (citations omitted) and Fed. R. Civ. P. 8(a)(2)).

[1] Defendant Fesen's memorandum in support of his motion (Doc. 44) contains a section entitled "Statement of Uncontroverted Facts." The United States disputes the statement to the extent that it does not quote the Complaint and/or mischaracterizes the contents of the Complaint. For example, Fesen's memorandum asserts that ¶ 243 of the Complaint asserts that the subject allegation is based on incorrect diagnoses. However, Fesen leaves out the dependent ¶ 242 which, with ¶ 243, states that defendants alternatively violated the FCA by "certifying that treatments were medically necessary when they actually were not."

**B. Fed. R. Civ. P. 9(b)**

In an analogous FCA case involving false claims of medical necessity, the Tenth Circuit recently described the standard of review for motions to dismiss under Fed. R. Civ. P. 9(b) as follows:

> The purpose of Rule 9(b) is "to afford defendant[s] fair notice of plaintiff's claims and the factual ground upon which [they] are based." *Id.* at 1172 (quotations omitted). "Thus, claims under the FCA need only show the specifics of a fraudulent scheme and provide an adequate basis for a reasonable inference that false claims were submitted as part of that scheme." *Id.* Practically speaking, FCA claims comply with Rule 9(b) when they "provid[e] factual allegations regarding the who, what, when, where and how of the alleged claims." *Id.* But, "in determining whether a plaintiff has satisfied Rule 9(b), courts may consider whether any pleading deficiencies resulted from the plaintiff's inability to obtain information in the defendant's exclusive control." *George v. Urban Settlement Servs.*, 833 F.3d 1242, 1255 (10th Cir. 2016). This reflects the principle that "Rule 9(b) does not require omniscience; rather the Rule requires that the circumstances of the fraud be pled with enough specificity to put defendants on notice as to the nature of the claim." *Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 803 (6th Cir. 2012) (quotation omitted).

*United Stats ex rel. Polukoff v. St. Mark's Hospital*, 895 F.3d 730, 754 (2018), *petition for cert. filed*, _ U.S. _, (Jan. 14, 2019) (No. 18-911). Rule 9(b) itself also states: "Malice, intent, knowledge, and other conditions of a person's mind may be alleged *generally*." Fed. R. Civ. P. 9(b) (emphases added). Finally, even in an action under the FCA, a plaintiff is "not required to provide a factual basis for every allegation; nor must every allegation contain all the necessary information. *Lemmon*, 614 F.3d, 1173." *United States ex rel. v. Hospice Care of Kansas, LLC*, 2010 WL 5067614 *6 (D. Kan. 2010).

### C. Fed. R. Civ. P. 8

Fed. R. Civ. P. 8 specifically allow litigants to plead alternative theories of recovery. *See* Fed. R. Civ. P. 8(a)(3) (authorizing a party to plead "relief in the alternative or different types of relief") and also contemplates inconsistent and even hypothetical statements of a party's claim or defense. *See* Fed. R. Civ. P. 8(d)(2) (allowing a party to "set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient."); *see also* Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient.").

## II. The Allegations

### A. The False Claims Act

The FCA imposes civil liability where a defendant knowingly presents or causes to be presented a "false or fraudulent claim" to the government, 31 U.S.C. § 3729(a)(1)(A); uses or causes to be made or used a false record or statement, *Id. at* § 3729(a)(1)(B); or uses or causes to be made or used a false record or statement material to an obligation to pay or transmit money to the Government or knowingly and improperly avoid an obligation to pay or transmit money to the Government, *Id. at* § 3729(a)(1)(C). It applies broadly to address a wide variety of fraudulent schemes, and it was drafted "expansively . . . to reach all types of fraud, without qualification, that might result in financial loss to the Government." *Cook Cty. v. United States ex rel. Chandler*, 538 U.S. 119, 129 (2003) (quotation marks omitted); *see also United States v. Neifert-White* Co., 390 U.S. 228, 232 (1968) (Congress intended the FCA to "reach all types of fraud, without qualification, that might result in financial loss to the Government."); *United*

*States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1171 (10th Cir. 2010) (recognizing the FCA's "broad application to 'all fraudulent attempts to cause the Government to pay out sums of money.'" (*quoting United States v. Neifert–White Co.*, 390 U.S. 228, 233 (1968)).

"Knowingly" is defined in the FCA to "mean that a person, with respect to information," either "has actual knowledge of the information," "acts in deliberate ignorance of the truth or falsity of the information," or "acts in reckless disregard of the truth or falsity of the information." *Id.* § 3729(b)(1)(A). No proof of specific intent to defraud is required. *Id.* § 3729(b)(1)(B). The Act defines an "obligation" to mean "an established duty, whether or not fixed, arising from . . . statute or regulation, or from the retention of any overpayment . . . *Id.* § 3729(b)(3).

**B. Medicare and Tricare**

The Medicare Act provides that "no payment may be made . . . for any expenses incurred for items or services . . . which . . . are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A). A provider requesting reimbursement from Medicare must certify that the services at issue were "medically necessary." Centers for Medicare & Medicaid Servs. (CMS), Form 1500, https://go.usa.gov/xNGvF. The Secretary of Health and Human Services can determine whether an item or service is reimbursable either "by promulgating a generally applicable rule or by allowing individual adjudication." *Heckler v. Ringer*, 466 U.S. 602, 617 (1984). If the Secretary chooses the former course, the Secretary can issue a "national coverage determination" that announces "whether or not a particular item or service is covered nationally." 42 U.S.C. § 1395ff(f)(1)(B). If there is no applicable national coverage determination, a

Medicare contractor may issue a "local coverage determination" stating whether an item or service is covered within that contractor's jurisdiction. Id. § 1395ff(f)(2)(B). Where there is no applicable national or local coverage determination, Medicare contractors "make individual claim determinations . . . based on the individual's particular factual situation." 68 Fed. Reg. 63,692, 63,693 (Nov. 7, 2003). Contractors may reimburse providers for items and services that are "[s]afe and effective," "[n]ot experimental or investigational," and "[a]ppropriate." CMS, Medicare Program Integrity Manual § 13.5.4 (current version:https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/pim83c13.pdf (addressing local coverage determinations). One factor relevant to whether an item or service is "[a]ppropriate" is whether it is "[f]urnished in accordance with accepted standards of medical practice . . ." *Id.* § 13.5.4.

The Medicare Benefit Policy Manual also states that "drugs and biologicals are covered only if . . . [t]hey are reasonable and necessary for the diagnosis or treatment of the illness or injury for which they are administered according to accepted standards of medical practice." Medicare Benefit Policy Manual, Ch. 15 at 50 (current version: https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/bp102c15.pdf) Similarly, Tricare only pays for "medically or psychologically necessary services and supplies required in the diagnosis and treatment of illness or injury . . . ." 32 C.F.R. § 199.4(a)(1)(i). Tricare also prohibits the submission of claims that are not medically necessary or do not meet accepted standards of care, and failing to maintain adequate medical records. 32 C.F.R. §§ 199.9(b)(3)-(b)(5).

### C. The Complaint

"At the motion-to-dismiss stage, [the court] must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff."

*Polukoff*, 895 F.3d at 736 (citing *Albers v. Bd. of Cty. Comm'rs of Jefferson Cty.*, 771 F.3d 697, 700 (10th Cir. 2014). The Complaint in this case alleges that defendants submitted or caused to be submitted false claims to Medicare and Tricare for procedures that they knew or had reason to know were not medically necessary, and that the clinic knowingly and improperly retained overpayments from those federal programs.

These allegations meet the requirements of Fed. R. Civ. P. 12(b). As The Tenth Circuit Court of Appeals recently stated,

> "[C]laims for medically unnecessary treatment are actionable under the FCA." *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004) (holding relator's complaint "sufficiently allege[d] that statements were known to be false, rather than just erroneous, because she assert[ed] that Defendants ordered the services knowing they were unnecessary"); *cf. Frazier ex rel. United States v. Iasis Healthcare Corp.*, 392 F. App'x 535, 537 (9th Cir. 2010) (affirming FCA claim was inadequately pled, but suggesting an FCA claim could survive if the relator "provide[s] 'reliable indicia' that [the defendant] submitted claims for medically unnecessary procedures")).

*Polukoff*, 895 F.3d at 743.

The court then concluded:

> We thus hold that a doctor's certification to the government that a procedure is "reasonable and necessary" is "false" under the FCA if the procedure was not reasonable and necessary under the government's definition of the phrase.

*Id.*

In this case, the Complaint pleads factual allegations regarding the "who, what, when, where and how of the alleged claims" and "alleges specifics to show an adequate basis for a reasonable inference that false claims were submitted." *See Id.* at 745. These factual allegations, when accepted as true and viewed in the light most favorable to the United States, support a plausible inference that defendants violated the False Claims Act. This is the government's only burden at this time; the government is not required to prove every element of its case in its

Complaint. Moreover, these well-pleaded facts, as well as the specific examples of false claims provided, give defendants fair notice of the government's claims and their factual basis and, thus, satisfy the pleading requirements of both Rules 12(b)(6) and 9(b).

As alleged, claims to Medicare and Tricare for Defendant Fesen's administration of Rituxan, a monoclonal antibody used in fighting cancer, are false because the drug was not medically indicated for its use. Further, Fesen's administration of the drug contravened a specific Medicare local coverage decision ("LCD") (Doc. 25 at ¶ 49), and medical industry standards as incorporated in the LCD. (Doc. 25 at ¶ 52). The Complaint also alleges that Defendant Hutchinson Clinic knew of these requirements and incorporated the LCD's language into its own guidelines for chemotherapy, stating in its own internal policy, "Medicare guidelines require NCCN category 1 or 2A, or DrugDex Class 1, 2a, or 2b for payment," and that "[c]overage for medication is based on the patient's condition, the appropriateness of the dose and route of administration, based on the clinical condition and the standard of medical practice regarding the effectiveness of the drug for the diagnosis and condition. The drug must be used according to the indication and protocol listed in the accepted compendia ratings." (Doc. 25 at ¶ 51).

The Complaint details how Hutchinson Clinic leadership learned from staff complaints as early as January 2008 that Defendant Fesen constantly asked clinic staff how to get around internal policies (Doc. 25 at ¶ 85). Indeed, another clinic oncologist separated his practice from Fesen because Fesen did not believe in following oncology guidelines. (Doc. 25 at ¶ 82). Fesen even told that clinic oncologist that he didn't believe in the guidelines. (Doc. 25 at ¶ 82). The Complaint also alleges that Senior Hutchinson Clinic leadership met in late 2009 to address concerns regarding the use of chemotherapy drugs in the Oncology Department (Doc. 25 at ¶¶

89, 90), and even mandated that Fesen become compliant with "Medicare rules." (Doc. 25 at ¶ 92). Despite this, for at least six months the clinic took no action to investigate further (Doc. 25 ¶ 94).

Eventually, as described in the Complaint, Hutchinson Clinic ordered a series of internal audits performed on or about June and September 2010, and April 2011 by a consultant who concluded that many of Fesen's treatments were not medically appropriate. Hutchinson Clinic hired Dr. Gingrich, the medical director from the University of Iowa, College of Medicine, as a consultant to review the oncology practice at the clinic. (Doc. 25 at ¶¶ 95 – 98). As alleged in the Complaint, Dr. Gingrich, during the first audit, rejected the treatment Fesen provided to five randomly selected patients (who were also Medicare beneficiaries) because the treatment was not in compliance with compendia guidelines. (Doc. 25 at ¶¶ 101, 102). Dr. Gingrich also concluded that Fesen's use of Rituxan for one patient was "not evidence based." (Doc. 25 at ¶ 103). During the second audit, Dr. Gingrich reviewed fifty-nine more patients and concluded that Fesen did not comply with compendia guidelines (Doc. 25 at ¶ 112); and concluded that in seven cases Fesen gave Rituxan inappropriately. (Doc. 25 at ¶ 117). In October 2010, Dr. Gingrich emailed the clinic's CFO, stating Fesen was "ignoring national consensus practice guidelines for treating cancer patients;" the email was forwarded to the clinic's CEO and discussed with the clinic's Administrative Council (Doc. 25 at ¶ 130). The third audit also found medically unnecessary administration of Rituxan by Fesen (Doc. 25 at ¶ 157).

The Complaint also alleges that, in 2011, the relator, Hutchinson Clinics' oncology group's clinical pharmacist, provided several examples to the clinic's CFO and CEO of Fesen administering drugs, including Rituxan, when the patients did not have a pathology to support the diagnosis purportedly being treated. (Doc. 25 at ¶ 143).

Specific examples are set forth in the Complaint of nine patients for whom claims were submitted and paid for medically unnecessary infusions of Rituxan. (Doc. 29 at ¶¶ 25- 39). For example, a lab report for Patient A contained a diagnosis of "no evidence of lymphoma" (Doc. 25 at ¶ 171) and a radiation oncologist disputed Fesen's use of Rituxan (Doc. 25 at ¶ 172). Medical records for Patient G showed a diagnosis of lymphoma, but show no progression of the disease; and subsequent biopsies showed no lymphoma at all. (Doc. 25 at ¶ 204). For Patient H, claims were submitted for Rituxan despite a lab report showing no evidence of non-Hodgkin's B-cell lymphoma in November 2007 and a negative PET scan in September 2008. (Doc. 25 at ¶ 211). Patient I was diagnosed with diffuse lymphoma in June 2003 and found free of the disease in January 2004, but still claims were subsequently submitted for Rituxan. (Doc. 25 at ¶ 216 - 222).

As did the Complaint in *Polukoff*, the Complaint alleges that the claims "violated both industry guidelines and hospital guidelines;" it alleges "that other physicians objected to" Fesen's practice; and the Complaint describes the clinic's internal audits which "concluded that its 'guidelines had been violated in many of the . . . cases reviewed.'" *Polukoff*, 895 F.3d at 743.

**III. The Defendants Arguments**

Defendant Hutchinson Clinic asserts the following arguments for their motion: (1) Count I fails to state a claim and does not adequately allege material false claims or knowledge; (2) Count II fails to allege any false statements or records; (3) Count III fails to allege false statements or records prior to the Fraud Enforcement and Recovery Act, and fails to allege an obligation; and (4) the common law Counts IV and V are not available to the United States. Dr. Fesen joins those arguments and further makes his own materiality arguments. Each assertion should fail and is addressed separately.

**A. Count I**

**1. Count I Sufficiently Alleges Specific False Claims**

In an introduction to their arguments, defendants assert that the Complaint only alleges a general scheme to defraud rather than specific false claims. (Doc. 42 at p. 11). The defendants are simply wrong. The Complaint does not merely describe an overarching scheme to defraud. The Complaint specifically describes in detail why the claims for Defendant Fesen's administration of Rituxan are false based upon Medicare and medical reasons. It also describes in detail how staff were concerned that Fesen wanted to get around guidelines, and how the clinic's internal investigations reached the conclusion that Fesen's use of Rituxan did not follow Medicare and medical industry guidance. Rather than merely describing the overall conduct, the Complaint provides specific patient examples of claims submitted for Rituxan when it was not medically indicated. (Doc. 25 at ¶¶ 169 – 224). Moreover, the defendants' arguments that nothing on the claim submitted is allegedly false ignore the Complaint's false claims allegations. These allegations assert that the claims, when submitted, contained the express false certification that the "services on this form were medically necessary . . ." (Doc. 25 at ¶ 47) when, in fact, they were not. As discussed in *Polukoff*, 895 F.3d 730, 742-743, such certifications are false under the False Claims Act.

Defendants also suggest that the specific patient examples in the Complaint are insufficient and that statistical samples are somehow required. (Doc. 42 p. 12). Statistical sampling is not required at this stage. FCA claims "need only show the specifics of a fraudulent scheme and provide an adequate basis for a reasonable inference that false claims were submitted as part of that scheme." *United States ex rel. Landis v. Hospice Care of Kansas, LLC,* 2010 WL 5067614 *6 (D. Kan. 2010) (Rule 9(b) met where complaint identified 27 patients, specific

instances related to those patients that they allege caused false claims, and the false claims submitted for payment); s*ee also United States v. Villaspring Health Care Center, Inc.* 2011 WL 6337455 at *5 ( E.D. Ky. 2011) (complaint containing specific allegations regarding five representative patients is pleaded with sufficient particularity for purposes of Rule 9(b)); *United States ex rel. Pogue v. Am. Healthcorp*., Inc., 977 F. Supp. 1329, 1332–33 (M.D. Tenn. 1997) (permitting relator to omit allegations concerning each instance of fraudulent conduct).

The defendants' introductory assertions do not support dismissal of the Complaint.

**2. Count I Sufficiently Pleads Materiality**

Defendants contend that the Complaint fails to adequately plead materiality in two ways: (1) there is no medical or scientific basis that the treatments were not medically necessary and reasonable; and (2) the Medicare intermediary that processed the claims was aware that Dr. Fesen's claims failed to comply with the Compendia and continued to pay the claims. These arguments fail for several reasons. In support of its argument that the Complaint does not allege materiality because it lacks a reason why Rituxan was not medically necessary, the clinic cites *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 779-80 (7th Cir. 2016). The facts in that case, however, are completely distinguishable. The court in *Presser* found that the relator's complaint provided "no medical, technical, or scientific context" and did "not reference policies or practices . . . regulations, or other publications" concerning the care at issue and offered only the relator's personal view of medical necessity. *Id.* at 779. The complaint in *Presser* lacked all the factual allegations the Complaint in this matter specifically includes, namely, a Medicare coverage decision that incorporates medical evidence based compendia, and conclusions by the clinic's own medical review showing claims did not follow Medicare and industry guidelines, or its own policies.

Defendants next argue that materiality is lacking because Medicare paid claims for Fesen's use of Rituxan when the Medicare claims processor knew of the compendia and of Fesen's history of claims for Rituxan's use beyond two years. The clinic's reliance on *Universal Health Services v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016) for this argument is misplaced. *Escobar* did not impose a heightened test for materiality. Instead, the case identifies several non-exhaustive factors to be evaluated by the courts in determining whether a violation is material. And, while the court listed factors to consider regarding materiality, materiality does not depend upon a single fact or occurrence, and the United States' treatment of the same or similar violations is only one of the several factors relevant to the question.

The *Escobar* decision reaffirmed that the "term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Escobar*, 136 S. Ct. at 2002. The Court explained that the focus of the materiality inquiry is "the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Id*. at 2002. The Court further held that this inquiry can be undertaken from either the perspective of a "reasonable person" or the particular defendant: a matter is material "(1) '[if] a reasonable [person] would attach importance to [it] in determining his choice of action in the transaction''; or (2) if the defendant knew or had reason to know that the recipient of the representation attaches importance to the specific matter 'in determining his choice of action,'" regardless of whether a reasonable person would do so. *Id*. at 2002-2003 (quoting in part Restatement (Second) of Torts § 538, at 80)).

The Supreme Court identified a variety of additional factors bearing on the materiality inquiry, including whether the violation goes to the "essence of the bargain," *id*. at 2004 n. 5 (*quoting Junius Constr. Co. v. Cohen*, 257 N.Y. 393, 400 (1931)), whether the violation is

significant or "minor or insubstantial," *id*. at 2003, and the actions the government took in this or other cases where the government had knowledge of similar violations. *Id*. at 2003-2004. In addition, the Court stressed that no one factor is automatically dispositive. *Id*. at 2001 (citing *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 39 (2011) for the proposition that "materiality cannot rest on a 'single fact or occurrence as always determinative'"); *see also United States ex rel. Escobar v. Universal Health Servs., Inc*., 842 F.3d 103, 109 (1st Cir. 2016) (on remand from the Supreme Court, the First Circuit stated, "The language that the Supreme Court used in *Escobar II* makes clear that courts are to conduct a holistic approach to determining materiality in connection with a payment decision, with no one factor being necessarily dispositive."); and *United States v. Quicken Loans, Inc*., 239 F.Supp.3d 1014, 1037 (E.D. Mich, March 9, 2017) ("Declining to provide any sort of bright-line test for materiality, the Supreme Court [in *Escobar*] endorsed a more holistic approach[.]"). Thus, materiality is a flexible standard that can be met in a variety of circumstances. *Id*. at 2001-03.

*Escobar* also does not require an FCA plaintiff to plead prior government denials of payment for similar violations. There is no question that the Supreme Court indicated that how the government has treated the same or similar violations is a relevant factor to the materiality inquiry. *Escobar*, 136 S. Ct. at 2003. Nonetheless, this is just one of the several non-dispositive materiality factors delineated by the Supreme Court.

Payment of Fesen's claims in no way negates materiality. Federal health care programs make clear that providers will not be paid for items or services that patients do not medically need. The programs also rely on the integrity of the provider to submit legitimate claims. The United States is charged with ensuring the delivery of health care to many millions of Americans and the impulse to halt payments in the face of fraudulent conduct is necessarily tempered by the

need to ensure adequate access to health care, including considerations such as the unavailability of similar services from different providers.

Defendants' position would require the United States to review the medical records for every claim or comb the medical billing history of every provider before paying a claim. The defendant's argument, if accepted, would also require the United States to initiate the administrative overpayment process just to demonstrate materiality. Worse, under the defendants' view, the United States would be limited to *only* pursuing the administrative processes for wrongful payments for medical claims that violate *published* Medicare guidelines or medical industry standards regarding medical necessity. Nothing in *Escobar* suggests that the government must immediately stop all payments or always initiate enforcement proceedings in order to establish that certain types of violations are material to payment.

For his argument regarding materiality, Defendant Fesen first cites *U.S. ex rel. Harman v. Trinity Industries, Inc.*, 872 F.3d 645 (5th Cir. 2017). That case, concerning summary judgment, involved false claims for allegedly defective highway guardrails. However, as noted in a recent FCA case involving medical false claims after *Escobar*, "*Trinity* is factually distinguishable. Unlike this case, the evidence at trial demonstrated that the government agency had actual knowledge of the violations, thoroughly investigated them, expressly approved the traffic guardrail system despite the violations, and approved reimbursement. *Id. at* 647, 663-664." *United States v. Sand Lake Cancer Ctr., P.A.*, 2019 WL 423156 *4 (SM.D. Fla. 2019).

Fesen next relies on *United States ex rel. Hess v. Sanofi–Synthelabo Inc.*, 2006 WL 1064127 (E.D. Mo. Apr. 21, 2006). That case is factually distinguishable for a myriad of reasons. In *Hess*, the relator alleged that a pharmaceutical company caused doctors to submit false claims for two of the company's drugs, Elitek and Eloxatin, because the company marketed off-label

use of the drugs. The court stated that, as to Elitek, the relator only alleged that the defendant trained relator and other sales representatives and encouraged them to promote off-label uses. *Id.* at *6. Critically, the court found that the relator "fail[ed] to allege that doctors to whom Plaintiff promoted off-label use of Elitek actually submitted false claims to the Government for off-label prescriptions…" *Id.*

While the *Hess* court concluded under the facts in that case that the only statement material to Medicare reimbursement is that the patient has cancer and that the government did not inquire further into whether the drug is approved for a particular cancer stage, *Id*. at *7, there were more significant distinguishing factors fatal to that relator's complaint regarding the drug Eloxatin. Most significantly, the relator in *Hess* was required to sufficiently plead the falsity of the defendant manufacturer's statements promoting the drug. The court found that the relator could not do so because defendant had submitted multiple supplemental applications for the use of Eloxitan receiving FDA approval and that "Defendant was open with the Government regarding its intentions to market Eloxitan" for various settings." *Id. at* *8. Further, the "Medicare administrator . . . added Eloxatin to its policy with broad coverage for the treatment of colorectal cancer with Eloxatin, including treatment in the first line and adjuvant setting even though these were off-label uses. *Id. at* *2. There are no similar circumstances in this case.

The defendants argue that Rituxan is appropriate for some stages of lymphoma and that the Complaint only contains conclusory statements about medical necessity. However, the defendants ignore the specific patient examples included in the Complaint, which support the allegations that claims were submitted when Rituxan was not medically indicated. For example, the Complaint alleges that Fesen claimed the administration of Rituxan for Patient A, even though a lab report stated, "DIAGNOSIS: NO EVIDENCE OF LYMPHOMA" (Doc. 25 at ¶

171) and a radiation oncologist disputed Fesen's use of Rituxan (Doc. 25 at ¶ 172). For Patient G, medical records showed a diagnosis of lymphoma, but the medical records show no progression of the disease and subsequent biopsies showed no lymphoma at all. (Doc. 25 at ¶ 204). For Patient H, claims were submitted for Rituxan despite a lab report showing no evidence of non-Hodgkin's B-cell lymphoma in November 2007, and a negative PET scan in September 2008. (Doc. 25 at ¶ 211). Patient I was diagnosed with diffuse lymphoma in June 2003 and found free of the disease in January 2004, yet claims were subsequently submitted for Rituxan. (Doc. 25 at ¶ 216 - 222).

When, as alleged, the claims certified that Fesen's administration of Rituxan was medically necessary when the use was actually contrary to Medicare requirements, national standards, and contrary to the clinics' own medical records and other staff's findings, the allegations in the United States' Complaint satisfy the pleading requirements for Fed. R. Civ. P. 9(b).

Even were this Court to accept the defendants' position, this type of evidentiary inquiry is not appropriate on a motion to dismiss, where the sole question is whether the complaint plausibly alleges a violation of the statute. Absent an opportunity for discovery, it is not reasonable to expect or require detailed allegations concerning the United States' "actual knowledge" and the resulting pattern of action (or inaction) with respect to the types of violations alleged.

### 3. Count I Sufficiently Alleges Knowledge

The FCA defines "knowingly" to "mean that a person, with respect to information," either "has actual knowledge of the information," "acts in deliberate ignorance of the truth or falsity of the information," or "acts in reckless disregard of the truth or falsity of the

information." 31 U.S.C. § 3729(b)(1)(A). No proof of specific intent to defraud is required. *Id.* § 3729(b)(1)(B). And, as Fed. R. Civ. P. 9(b) states, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged *generally*." (emphases added).

The Complaint alleges that Hutchinson Clinic leadership learned from staff complaints as early as January 2008 that Defendant Fesen constantly asked clinic staff how to get around internal policies (Doc. 25 at ¶ 85) and that in early 2009, the relator, as the oncology group's clinical pharmacist, met with the clinic's then-CFO about Fesen. (Doc. 25 at ¶ 86). The Complaint, citing September 2009 meeting minutes of the clinic's Administrative Council, also alleges that the clinic' Council discussed "concerns with the use of chemotherapy drugs in the Oncology Department," including specific examples (Doc. 25 at ¶ 89); that the Council discussed "clinical billing concerns relative to certain chemotherapy regimens being prescribed by Dr. Fesen." (Doc. 25 at ¶ 90); and, that in October 2009, the clinic mandated that Fesen become compliant with Medicare rules (Doc. 25 at ¶ 92). Despite the concerns, the clinic did not hire the outside expert to conduct an audit until June of 2010. (Doc. 25 at ¶ 98). Further, as alleged, while the clinic directed its oncology group's clinical pharmacist, the relator, to review Fesen's initial diagnosis and prescribed treatment (Doc. 25 at ¶ 135), the clinic had him only review new cases and not older treatment regimens for cases prior to November 2009. (Doc. 25 at ¶ 136). The Complaint sufficiently alleges that Hutchinson Clinic knew what its staff knew and senior leadership knew.

> "'It is well established that a corporation is chargeable with the knowledge of its agents and employees acting within the scope of their authority.'" *W. Diversified Servs., Inc. v. Hyundai Motor Am., Inc.*, 427 F.3d 1269, 1276 (10th Cir. 2005); *see also United States ex rel. Jones v. Brigham & Women's Hosp.*, 678 F.3d 72, 82 n.18 (1st Cir. 2012) ("We have long held that corporate defendants may be subject to FCA liability when the alleged misrepresentations are made while the employee is acting within the scope of his or her

> employment."). Thus, under Rule 9(b), it suffices that *any* employee, acting within the scope of his or her employment, had knowledge."

*Polukoff*, 895 F.3d 746, n. 9; *see also United States v. Anchor Mortg. Corp.*, 711 F.3d 745, 747-48 (7th Cir. 2013) ("Corporations . . . 'know' what their employees know, when the employees acquire knowledge within the scope of their employment and are in a position to do something about that knowledge.").

The Complaint's allegations sufficiently plead the knowledge required. Fesen knew or should have known, for the purposes of pleading a violation of the FCA, that claims for his administration of Rituxan were not medically necessary and contrary to Medicare and medical guidelines when pathologies and lab results showed no cancer or were otherwise not medically indicated and Fesen's knowledge is attributable to the clinic. The clinic's staffs' concerns about Fesen were also known by the clinic, and senior leadership was aware of the concerns and specific instances of Fesen's treatments that violated Medicare and medical guidelines. By failing to investigate further, and then by failing to repay claims identified by the clinic's expert's audits as violating Medicare and medical guidelines regarding medical necessity, the clinic acted with actual knowledge or deliberate ignorance and the clinic ratified Fesen's false claims. At the very least, the Complaint sufficiently alleges the clinic's deliberate ignorance of or reckless disregard for the truth or falsity of claims for Fesen's Rituxan treatments.

**B. Count II**

"Section 3729(a)(1)(B) of the False Claims Act subjects to civil liability 'any person who . . . knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim.' 31 U.S.C. § 3729(a)(1)(B). This section 'does not demand proof that the defendant presented or caused to be presented a false claim to the government or that the defendant's false record or statement itself was ever submitted to the Government.'" *United*

*States ex rel. Heesch, Diagnostic Physicians Group, P.C.*, 2014 WL 2155363 *7 (S.D. Ala. 2014) (quoting *Hopper v. Solvay Pharmaceuticals, Inc.*, 588 F.3d 1318 at 1327 (5th Cir. 2009)); *see also United States v. Triple Canopy, Inc.*, 775 F.3d 638, 639 (4th Cir. 2015) ("A false record may, in the appropriate circumstances, have the potential to influence the Government's payment decision even if the Government ultimately does not review the record."), *generally reinstated on remand*, 857 F.3d 174, 177 n. 2 (4th Cir. 2017) ("Nothing in *Universal Health* [*v. Escobar*] affects our conclusion that the Government properly pled a false records claim under § 3729(a)(1)(B)…").

The Complaint alleges that Fesen's records are false and were used to justify claims for the administration of Rituxan when it was not medically indicated as the clinic billed for services provided by Fesen. (Doc. 25 at ¶ 71). The Complaint provides an example of a record noted by Dr. Gingrich, hired by the clinic to perform the audits, where Fesen listed a patient's diagnosis of non-Hodgkin's lymphoma when other medical records reflected no positive pathology and Dr. Gingrich found the administration of Rituxan "unnecessary" and "unbelievable." (Doc. 25 ¶ at 104). For another patient given Rituxan, Dr. Gingrich wrote, "Diagnosis not clear/treatment striking unconventional and not evidence-based – Deny." (Doc. 25 at ¶ 103). For Patient A, the Complaint shows claims submitted for Rituxan after a lab report stated, "DIAGNOSIS: NO EVIDENCE OF LYMPHOMA." (Doc. 25 at ¶ 171). Regarding Patient H, the Complaint describes a lab report in November 2007 showing no evidence of non-Hodgkin's B cell lymphoma, but in January 2008, Fesen concluded that the patient had "Recurrent non-Hodgkin lymphoma," and in September 2008, Fesen noted that the patient had non-Hodgkin's Lymphoma despite a negative PET scan. (Doc. 25 at ¶¶ 211, 212).

The Complaint alleges Fesens' false documents regarding the justification for Rituxan and specific claims to the federal programs for Rituxan when the administration of the drug was not medically indicated and contrary to Medicare guidelines.

### C. Count III Sufficiently States a Claim That Hutchinson Clinic Knowingly and Improperly Avoided an Obligation to Repay Money to the Government after May 2009

The Complaint alleges that the clinic violated 31 U.S.C. § 3729(a)(1)(G) of the False Claims Act ("FCA") when it improperly failed to return Medicare and Tricare overpayments after the overpayments were identified by their own employees and internal audits conducted by its hired expert. Prior to 2009, the False Claims Act provided that a person who "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government" was liable to the United States for civil penalties and treble damages. 31 U.S.C. § 3729(a)(7) (2000). This provision, referred to as the "reverse false claims" provision, was amended in 2009, when Congress passed the Fraud Enforcement and Recovery Act, Pub. Law 111-21, 123 Stat. 1617 (2009) ("FERA"). FERA extensively amended the FCA, and amended the reverse false claims provision to create liability for a person who:

> knowingly makes, uses, or causes to be made or used, a false record or statement <u>material to</u> an obligation to pay or transmit money or property to the Government, <u>or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.</u>

31 U.S.C. § 3729(a)(1)(G) (emphasis added to indicate new language included in the FERA-amended provision). Thus, under the second clause of the amended reverse false claim provision, a party that "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government" is liable to the United States for a civil penalty between $5,500 and $11,000 and treble damages. *See id.* § 3729(a)(1).

Significantly, FERA also amended the FCA by including a definition of "obligation," as "an established duty, *whether or not fixed*, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, *or from the retention of any overpayment*." 31 U.S.C. § 3729(b)(3) (emphasis added). Prior to 2009, "obligation" had not been defined in the FCA, and in adding this definition, Congress noted that "[t]he new definition of 'obligation' includes an express statement that an obligation under the FCA includes 'the retention of an overpayment.' The Department of Justice supported the inclusion of this provision and provided technical advice that the proper place to include overpayments was in the definition of obligation." S. Rep. No 111-10, at 15 (2009), *reprinted at* 2009 U.S.C.C.A.N. 430, 441.

The definition of "obligation" was also added by FERA in order to correct, among other cases, the Sixth Circuit's decision in *American Textile Mfrs. Institute, Inc. v. The Limited, Inc.*, 190 F.3d 729 (6th Cir. 1999), which narrowly defined "obligation" to include only obligations that were established and fixed in all particulars. S. Rep. No. 111-10, at 14, fn. 10, reprinted in 2009 U.S.C.C.A.N. 430, 441. That decision concluded that "a reverse false claim action cannot proceed without proof that the defendant made a false record or statement at the time the defendant owed to the Government *an obligation sufficiently certain to give rise to an action of debt at common law*" and did not encompass "[c]ontingent obligations." The Limited, 190 F.3d at 736 (emphasis added). *See also* S. Rep. No. 111-10, at 14, *reprinted in* 2009 U.S.C.C.A.N. 430, 441, n. 13 (citing with disapproval *United States v. Q Int'l Courier, Inc*., 131 F.3d 770, 774 (8th Cir. 1997), which held that for there to be FCA liability, the obligation "must be for a fixed sum that is immediately due").

Congress corrected the narrow definition of "obligation" set forth in *The Limited* and *Q Int'l Courier* and specifically noted that FERA

> addresses [the] current confusion among courts that have developed conflicting definitions of the term "obligation" in Section 3729(a)(7). The term "obligation" is now defined under new Section 3729(b)(3) and includes fixed and contingent duties owed to the government-including fixed liquidated obligations such as judgments, and fixed, unliquidated obligations such as tariffs on imported goods. It is also noteworthy to restate that while the new definition of "obligation" expressly includes contingent, non-fixed obligations, the Committee supports the position of the Department of Justice that current section 3729(a)(7) [ ]speaks of an "obligation," not a "fixed obligation." By including contingent obligations such as, "implied contractual, quasi-contractual, grantor-grantee, licensor-licensee, fee-based, or similar relationship," this new section reflects the Committee's view, held since the passage of the 1986 Amendments, that an "obligation" arises across the spectrum of possibilities from the fixed amount debt obligation where all particulars are defined to the instance where there is a relationship between the Government and a person that "results in a duty to pay the Government money, whether or not the amount owed is yet fixed."

S. Rep. No. 111–10, at 14 (citations omitted).

The Senate Report approvingly cited *United States ex rel. Bahrani v. Conagra, Inc*., 465 F.3d 1189 (10th Cir. 2006), for its construction of "obligation." *See* S. Rep. 111-10 at 14, fn. 14. Bahrani held that "obligation" in the pre-FERA reverse false claim provision encompassed "instances in which a party is required to pay money to the government, but, at the time the obligation arises, the sum has not been precisely determined." *Bahrani*, 465 F.3d at 1201. In that case, the relator alleged that the defendant falsified documents to avoid paying certain fees to the U.S. Department of Agriculture for the issuance of replacement export certificates, but evidence in the record indicated that the agency sometimes exercised its discretion not to require a replacement certificate or to waive additional fees. The Tenth Circuit held that the absence of a fixed monetary obligation by the defendant to pay additional fees to the Government did not preclude a reverse false claim action. Further, despite evidence that the agency had the discretion not to require replacement certificates or additional fees in all instances, the *Bahrani* court held:

> [W]e are not convinced that this alleged discretion takes the obligation to pay the fees outside the scope of § 3729(a)(7). Some discretion inheres in a wide variety of government decisions. For example, government officials may have discretion as to whether to insist on a party's performance under a contract or whether to file a breach of contract action if a party does not perform. However, a contractual obligation falls within the scope of § 3729(a)(7).

*Bahrani*, 465 F.3d at 1204. The Tenth Circuit concluded, "We therefore agree with the government that 'the need for some further governmental action or some further process to liquidate an obligation does not preclude a reverse false claims action.'" Id.

Accordingly, the Senate Judiciary Committee noted, a "reverse" false claim violation is committed "once an overpayment is knowingly and improperly retained, without notice to the Government about the overpayment," S. Rep. No. 111-10, at 15, and "that an 'obligation'" exists "'whether or not the amount owed is yet fixed.'" Id. at 14 (quoting Brief for United States at 24, *United States v. Bourseau*, No. 06-56741 (9th Cir. July 14, 2008)), reprinted in 2009 U.S.C.C.A.N. 430, 441). Thus, in 2009, Congress substantially altered the reverse false claims landscape by imposing liability where a party recklessly disregarded its obligation to refund an overpayment.

Finally, FERA did not substantively amend the terms "knowing" or "knowingly," which the FCA defines to mean when a person, with respect to information, either has actual knowledge of the information, acts in deliberate ignorance of the truth or falsity of the information, or acts in reckless disregard of the truth or falsity of the information. *See* 31 U.S.C. § 3729(b)(1)(A). Also, no proof of specific intent to defraud is required. *Id*. § 3729(b)(1)(B).

The Complaint describes three separate audits commissioned by the clinic that concluded that Fesen's treatments did not comport with Medicare and national guidelines. The Complaint alleges how the clinic prevented the relator from reviewing claims prior to November 2009 (Doc. 25 at ¶ 136). In similar circumstances, courts have held that healthcare providers may not avoid

reverse-false-claims liability simply by ignoring audits or terminating investigations that would have revealed overpayments received from the government. In *Kane ex rel. United States v. Healthfirst, Inc.*, 120 F. Supp. 3d 370 (S.D.N.Y. 2015), for example, the court denied a motion to dismiss claims brought under § 3729(a)(1)(G) where the defendants were on notice that certain claims submitted to the government might contain erroneous billing codes. Likewise, in *United States ex rel. Keltner v. Lakeshore Medical Clinic, Ltd.*, No. 11-cv-00892, 2013 WL 1307013 (E.D. Wis. Mar. 28, 2013), the court held that the relator stated a claim under § 3729(a)(1)(G) where the defendant found high rates of improper "upcoding" by physicians in audits but failed to follow up on non-audited claims. The reasoning of those cases applies with equal force here. The clinic cannot escape FCA liability by conducting the sort of internal reviews alleged and then deliberately ignore information suggesting submission of medically unnecessary claims resulting in receipt of payments to which it was not entitled. As the plain text of the 2009 amendment establishes, the Government has sufficiently alleged a violation of the FCA's reverse false claims provision.

In addition, the Affordable Care Act and its interplay with the FCA provide an additional basis for the Court to find that the Government has alleged a violation of the reverse false claims provision. In 2010, Congress enacted the ACA which, among other things, sets forth requirements regarding the reporting and return of Medicare overpayments to the Department of Health and Human Services ("HHS") or the State, as appropriate (the "report and return" requirements). In that context, the ACA defined "overpayment" and, additionally, established a bright line rule that an overpayment must be returned to HHS or the State within 60 days after the overpayment was "identified" and that any overpayment retained after 60 days would be deemed to be an "obligation" for FCA purposes. While this provision provided a bright line for

healthcare providers for when overpayments must be returned and when FCA liability could be triggered, the ACA did not purport to narrow the reverse false claims provision of the FCA, which has wide application to all types of overpayments, i.e., not simply Medicare and Medicaid funds "knowingly" retained. Accordingly, the Court need not find a violation of the ACA to find a violation of the reverse false claims provision of the FCA.

The Complaint does not, as Defendants argue, "regurgitate" the same allegations for violations of the FCA §§ 3729(a)(1)(A) and (a)(1)(G). Count III of the Complaint stands on its own as it alleges that the clinic's audits identified past claims by Fesen that were false because they were not medically indicated, and alleges that the clinic took no action to look further and took no action to return the payments. The conduct at issue fits within the four corners of the reverse false claims provision: Hutchinson Clinic retained overpayments and did so "knowingly," as defined by the FCA, when it failed to repay the federal programs. The Court need look no further to find a violation of the reverse false claims provision of the FCA.

Defendants assert that the reverse false claims count must be dismissed because the Affordable Care Act ("ACA") was found to be unconstitutional in *Texas v. United States*, 340 F. Supp. 3d 579 (N.D. Tex. 2018). That case does not provide a basis for the motions to dismiss. On March 23, 2010, The ACA was signed into law on March 23, 2010. *See* Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (Mar. 23, 2010). As the Supreme Court explained, one of the "key provisions" of the ACA was the "individual mandate," which required most Americans to maintain "minimum essential" health insurance coverage for themselves and their dependents or pay a tax penalty. *Nat'l Fed'n of Indep. Bus. v. Sebelius* (*NFIB*), 567 U.S. 519, 539 (2012). In *NFIB*, the Supreme Court determined that the individual mandate was a valid exercise of Congress's taxation power. *Id.* at 574. In 2017, however,

Congress eliminated the tax penalty for failing to comply with the individual mandate, effective January 1, 2019. *See* Tax Cuts and Jobs Act of 2017, Pub. L. No. 115-97, 131 Stat. 2054. In December 2018, the United States District Court for the Northern District of Texas held that, as a result of that change, the ACA's individual mandate is unconstitutional. *Texas v. United States*, 340 F. Supp. 3d 579, 605 (N.D. Tex. 2018). The district court further ruled that, because Congress intended the health insurance provisions of the ACA to work together, the individual mandate provision is not severable from the rest of ACA, rendering the entire ACA invalid. *Id.* at 613-15. On December 30, 2018, the district court stayed enforcement of its order throughout the pendency of appellate proceedings. *Texas v. United States*, 352 F. Supp. 3d 665, 689 (N.D. Tex. 2018).

On March 25, 2019, the Civil Division of the United States Department of Justice sent a letter to the Fifth Circuit stating that the district court's judgment should be affirmed and it intends to file a brief on the appellees' schedule. However, that decision does not entitle Defendants to the relief they seek in this matter. The district court in the Texas case held that the ACA was rendered invalid as of January 1, 2019, when Congress zeroed out the tax penalty for individuals who fail to comply with the ACA's individual mandate and thus eliminated the only constitutional basis for the individual mandate. The court further held that this provision was not severable from the remainder of the ACA so the entire statute was rendered invalid. This does not, however, affect the validity of the ACA before January 1, 2019. Because the individual mandate was a valid exercise of Congress's tax power up until January 1, 2019, the Department's defense of the district court's decision in *Texas v. United States* has no effect on cases that rely on the ACA provisions for conduct that occurred before that date. The alleged

conduct in this case occurred prior to that date and is thus unaffected by the position in the Texas case.

**D. Count IV of the Complaint States a Common Law Claim for Unjust Enrichment and Count V States a Common Law Claim for Payment by Mistake.**

Defendant Hutchinson Clinic incorrectly argues that the common law claims in the Complaint are "implausible" because claims to Medicare are governed by a contract with the provider and that the counts fail to allege the absence of a valid contract. Defendant Fesen joins in the argument. The defendants' argument must fail because the claims at issue in this matter are not based on a contract. As several courts have held, the United States may bring common law claims with False Claims Act claims because Medicare Provider Agreements create statutory, not contractual rights. *United States v. Associates in Eye Care*, *P.S.C*., 2014 WL 414231 (E.D. Ky. 2014); *United States v. Villiaspring Heal Care Center, Inc*. 2011 WL 6337455 (E.D. Ky. 2011); *United States ex rel. Williams v. Renal Care Grp*., 2010 WL 1062634, at *11 (M.D. Tenn. 2010) (*citing United States ex rel. Roberts v. Aging Care Home Health, Inc*., 474 F.Supp.2d 810, 821 (E.D. La. 2007)).

Courts have also held the such common law claims may be asserted in the alternative to False Claims Act causes of action. As the court in *Associates in Eye Care* stated,

> Additionally, even apart from the nature of Medicare contracts, the Federal Rules permit parties to "state as many separate claims or defenses as the party has regardless of consistency and whether based on legal, equitable, or maritime grounds." Fed. R. Civ. P. 8(a). Therefore, the Court can permit plaintiffs to allege both breach of contract and unjust enrichment as alternative claims. *See, e.g., Tillson v. Lockheed Martin Energy Sys., Inc.*, 2004 WL 2403114, at *26 (W.D.Ky. Sep. 30, 2004) (permitting the government to retain both breach of contract and unjust enrichment claims even in the context of the FCA). The same reasoning applies to the payment by mistake claim, which according to Fed. R. Civ. P. 8(a), the United States is permitted to make in addition to, or as an alternative to the FCA claim, thus requiring even less detail

in pleading because of the lack of a *scienter* element. *See United States v. Fadul*, 2013 WL 781614, at *12 (D.Md. Feb. 28, 2013).

*Associates in Eye Care*, 2014 WL 414231, *8.

**IV. If the Court Determines the Complaint is Inadequately Plead, The United States Requests Leave to Amend**

The Government respectfully requests that, in the event any of its claims are deemed deficient, the United States be given an opportunity to amend the Complaint to cure the deficiency. Fed. R. Civ. P. 15(a)(2) provides that a court should "freely give leave [to amend] when justice so requires." Here, dismissal of the Government's claims with prejudice— without allowing the Government the benefit of the Court's rulings regarding the pleading requirements — would be inappropriate given the liberal nature of Rule 15(a).

**CONCLUSION**

For the foregoing reasons, the United States respectfully requests that the defendants' motions to dismiss be denied.

Respectfully submitted,

STEPHEN R. McALLISTER
United States Attorney
District of Kansas

By: s/ Jon P. Fleenor
JON P. FLEENOR
Assistant United States Attorney
Ks. S.Ct. No. 14002
500 State Street, Suite 360
Kansas City, Kansas 66101
PH: (913) 551-6730
FX: (913) 551-6541
Email: jon.fleenor@usdoj.gov
*Attorneys for the Plaintiff*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 13th day of May 2019, a true and correct copy of the above and foregoing United States' Consolidated Response to Defendants' Motions to Dismiss was filed with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all parties receiving CM/ECF notifications in this case.

s/ Jon P. Fleenor
JON P. FLEENOR
Assistant United States Attorney