**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>*ex rel.* FRANK TRA,<br>Plaintiff,<br>v.<br><br>DR. MARK R. FESEN and<br>HUTCHINSON CLINIC, P.A.,<br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 14-2249-JWB-KGG |

**DEFENDANT HUTCHINSON CLINIC, P.A.'S REPLY TO ITS MOTION TO DISMISS**

Pursuant to Fed. R. Civ. P. 8, 9, and 12(b)(6), Defendant Hutchinson Clinic, P.A. ("the Clinic") submits this Reply in support of its Motion to Dismiss, which seeks dismissal of the Government's Complaint In Intervention (Doc. 25). In its Response, the Government essentially contends that its allegations are close enough to the fraud-pleading standard for the Complaint in Intervention to survive the Defendants' Motion to Dismiss. This contention is erroneous for at least two reasons. First, it overlooks the fact that the Government has been investigating this case for over six years and has had every opportunity to gather the facts necessary to satisfy the heightened-pleading standard. Thus, the case law applying a relaxed standard when the Government opts not to intervene and a relator is forced to proceed without its assistance does not apply. Second, the Government's contention ignores the substantial liability and expense associated with an FCA case such as this, which is the very reason why courts require a higher level of specificity in the FCA context. *See, e.g.*, *United States v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 781 (7th Cir. 2016) (noting that "[t]he heightened possibility of mistake or bias supports the need for a higher standard of specificity for fraud compared to other civil litigation"). Accordingly, the Government should not be granted a free pass in this case, but, rather, held to the demanding standard applicable to FCA claims—a standard that it cannot satisfy.

## Argument

In its opening memorandum, the Clinic established that all of the Complaint In Intervention's five counts should be dismissed because they fail to plausibly state a claim. The Government responds by arguing that sufficient facts have been pled at this stage, and, therefore, the Clinic's motion to dismiss should be denied in its entirety. For the reasons stated below, as well as those in the Defendants' opening memoranda, the Government's arguments should be rejected and the Complaint In Intervention dismissed with prejudice.

### I. Count I fails to plausibly allege an actionable false claim.

In its Response, the Government asserts that Count I is adequate because it sufficiently alleges that specific claims are false, that the alleged claims' falsity is material, and that the Clinic had knowledge of such falsity. (Doc. 51, pgs. 11-19). None of these assertions holds water.

Beginning with falsity, it is not pled with the requisite level of specificity. Here, the Government does not contest the Clinic's observation that the Complaint In Intervention "does not provide one example of what a presented claim listed as its treatment's justification," (Doc. 42, pg. 12); rather, the Government implies that the Complaint In Intervention need not do so because it provided "specific patient examples" and any claim that was submitted would have "contained [an] express false certification that the 'services on th[e] form were medically necessary," (Doc. 51, pg. 11). The problem with the Government's position is twofold. First, without listing the treatment justification for the specific patients cited in the Complaint In Intervention, this Court cannot find that such treatment was unnecessary. Second, even if the treatment justification was listed, the Complaint In Intervention lacks enough detail to credit its claim that treatment for the specified patients was indeed unnecessary. In cases involving highly specialized fields, such as medicine, a complaint must provide "medical, technical, or scientific context which would enable

a reader of the complaint to understand why [the defendant's] alleged actions amount to unnecessary care forbidden by the statute." *Acacia Mental Health Clinic, LLC*, 836 F.3d at 779. Here, while some allegations say that some *unidentified* patients may have received unnecessary care, they do not say that a doctor, much less an oncologist, actually reviewed the medical records for the *specific patients* cited by the Government, which is significant because FCA liability is pegged to the submission of false claims, not the alleged existence of some underlying fraudulent scheme. As a result, the Government has failed to adequately plead falsity.

To be sure, an FCA proponent need not allege every claim it believes is false in order to adequately plead an FCA claim. As made clear in *United States v. Polukoff*, 895 F.3d 730, 745 (10th Cir. 2018), a sliding scale exists. When the FCA-claim proponent has limited to no discovery (*i.e.*, is merely a relator), less detail is typically required. When the proponent is the Government, however, and is thus equipped with subpoena power and interagency transfers of information leniency is not warranted. Therefore, in a case such as this, the Government must provide this Court with at least a few examples that contained a challenged representation and an explanation how and why such representation was false with respect to that specific patient. Because not even one example was provided, the Complaint in Intervention is infirm. *See United States ex rel. Minge v. TECT Aerospace, Inc.*, No. 07-1212, 2010 WL 10962025, at *10 (D. Kan. Feb. 3, 2010) (finding Rule 9 not met because the relator had not made "any allegations of 'when' a false statement was made to the government and the content of that statement").

Regarding materiality, the Government's argument starts from a faulty premise. According to the Government, "*Escobar* did not impose a heightened test for materiality." (Doc. 51, pg. 13). This is incorrect. As noted by the Tenth Circuit recently, the FCA's materiality and scienter requirements "are rigorous" and are to be "strict[ly] enforce[d]." *Polukoff*, 895 F.3d at 743. Thus,

the Government's intimation that materiality and falsity are on the same plane is erroneous, and this Court should treat the requirement exactly as Congress intended for it to be treated: a gatekeeper that ensures "fair notice" and prevents "open-ended liability." *Id.*

Turning to the substance of the Government's materiality argument, it is based on the notion that payment decisions are of little to no weight in the analysis. Incredibly, the Government does not allege that Dr. Fesen, like the physician in *Polukoff*, misrepresented his diagnoses or the treatment that he provided to his patients. Additionally, the Government does not claim that Dr. Fesen's alleged noncompliance with the applicable compendia was inconspicuous or somehow hidden from the responsible Medicare Administrative Contractor ("MAC"). After all, the Government alleges that its MAC paid Rituxan claims ordered by Dr. Fesen for many years after the alleged 2-year "medical protocol for such maintenance." (Doc. 25, ¶¶ 144, 184, 196 & 220).

Instead, the Government says that without an FCA claim, it faces a Hobson's choice of halting payment in every case in which fraud may be afoot or continuing payment and running the risk of never recouping money wrongly paid. (Doc. 52, pgs. 14-15). No Hobson's choice exists. First, if the Government chooses not to pay for cancer drugs like Rituxan for more than two years, it can order its MACs to program their computers and instruct their employees to reject claims for Rituxan for the same patient after a particular length of time, which it can[1] but did not do here.

Second, although the Government agrees that materiality focuses on "the effect on the likely or actual behavior of the recipient of the alleged misrepresentation," (Doc. 52, pg. 13 (citation omitted)), it discounts payment history as being merely one of a constellation of possible factors upon which materiality is to be determined. While it is true the Supreme Court has indicated

---

[1] *See, e.g.*, *Medicare & You*, The Official U.S. Government Medicare Handbook, at 30-49 (2019), https://www.medicare.gov/pubs/pdf/10050-medicare-and-you.pdf (last accessed June 9, 2019).

that payment history is not necessarily dispositive in every case, it is here. Again, the Government does not allege that Dr. Fesen misrepresented his treatment or diagnosis in his claims, as no content from any of the alleged claims is cited. The alleged noncompliance was not disguised. The MAC had all the information it needed to make a payment decision, *e.g.*, it was paying for Rituxan ordered by a specific physician for specific patients over long periods of time. That the MAC paid Dr. Fesen's claims and did so for a sustained period of time, despite Dr. Fesen's alleged non-compliance with the compendia, shows that compliance with the compendia (especially the alleged two-year treatment limit) was not material.

In a case where it is not alleged that the billed-for services were not rendered or that noncompliance was disguised, the Government cannot swoop in years after the fact and use the courts to challenge its own MAC's payment decisions. This is exactly the type of "open-ended liability" that the *Polukoff* stated the materiality requirement is intended to prevent.

The Government's Hobson's choice argument is based on a false dichotomy. Contrary to the Government's assertion, it need not "immediately stop all payments or always initiate enforcement proceedings in order to establish that certain types of violations are material." (Doc. 51, pg. 15). An FCA claim is not the only way for the Government to recoup money it believes its MACs wrongly paid. As noted in the Clinic's opening memorandum, alternative options exist other than accusing a party of defrauding it and threatening treble damages and $11,000 per payment that was made. (Doc. 42, pg. 19). Therefore, ostensible lack of alternatives should not be used as a justification for excusing a failure to show materiality in this case.

Finally, turning to knowledge, nothing in the Complaint In Intervention plausibly indicates the Clinic knew Dr. Fesen's claims for Medicare patients were false when they were submitted or that the Clinic was deliberately ignorant or acted in reckless disregard of that possibility. Quite the

opposite. The Clinic did not turn a blind eye to the internal allegations against Dr. Fesen's drug regimens when they arose. Specifically, when it first heard of the allegations, the Clinic mandated that Dr. Fesen continue to abide by Medicare's guidelines. Shortly thereafter, the Clinic put the Relator in charge of Dr. Fesen's drug treatment schedules, a role the Relator filled for roughly two years. On top of this, the Clinic also had three audits performed on Dr. Fesen to ensure compliance. Far from showing a head-in-the-sand approach, the Complaint In Intervention clearly demonstrates the Clinic did all it could to ensure that Dr. Fesen complied with Medicare's requirements.

Realizing this, as well as that the Complaint In Intervention clearly demonstrates the Clinic did not have actual knowledge of any falsity in Dr. Fesen's claims when they were submitted, the Government attempts to have Dr. Fesen's knowledge of his alleged unnecessary medical care imputed to the Clinic. (Doc. 51, pg. 19). Such an attempt is misguided. While it is true that courts have allowed an employee's knowledge to be imputed to their employer, they have done so when the employee was acting within the scope of his authority. Here, to the extent Dr. Fesen was administering medically unnecessary care, he was not only acting outside the scope of his employment, but also the confines the Clinic had affirmatively placed on his practice. Thus, any knowledge of wrongdoing that Dr. Fesen had cannot also be attributed to the Clinic.

**II. Count II fails to plausibly allege an actionable false-record claim.**

In the beginning of its argument regarding Count II, the Government quotes a line from *United States ex rel. Heesch, Diagnostics Physicians Group, P.C.*, No. 11-364, 2014 WL 2155363 (S.D. Ala. May 22, 2014). (Doc 51, pgs. 19-20), to challenge the Clinic's contention in its opening memorandum that a false-records claim requires a showing of a linkage between the alleged false record and a submitted claim. But even a cursory reading of the circuit court case from which the quote is derived, *Hopper v. Solvay Pharms., Inc.*, 588 F.3d 1318 (11th Cir. 2009), confirms that

such a linkage must be shown. Specifically, in *Hopper*, the Eleventh Circuit dismissed a false-records claim because it did "not link the alleged false statements to the government's decision to pay false claims" nor did it show that "the defendant intended that the false record or statement be material to the Government's decision to pay or approve the false claim." 588 F.3d at 1330 (citation omitted). Thus, even under the Government's authority, to adequately state a false-record claim against the Clinic, the Government must both identify the specific claim the MAC paid and the false record that was generated in support of it, as well as plausibly show that Dr. Fesen intended for the false record to influence the Government's payment decision. The Complaint In Intervention fails to make such a showing, providing no allegation of either linkage or scienter.

In its response, the Government cites to five paragraphs that it believes show that false records were generated: 103, 104, 171, 211, and 212. (Doc. 51, pg. 20). But each of these paragraphs fails to identify one specific false claim that the record in the cited paragraph supports. Furthermore, while the Government cites to its allegations that the Clinic relied upon Dr. Fesen's patient notes when billing Medicare, the Complaint In Intervention does not plausibly allege the records referenced in the cited paragraphs are the type, much less were intended to be, relied upon by the MAC. Finally, even if the necessary linkage and scienter had been pled, Count II still fails against the Clinic because, for substantially the same reasons stated above, the Government has not adequately alleged the Clinic had knowledge that Dr. Fesen had created false records intended to affect the MAC's payment decisions. Accordingly, Count II should be dismissed.

**III. Count III fails to plausibly allege an actionable reverse-false claim.**

The Government does not contest the Clinic's argument that the Complaint In Intervention is devoid of any pre-May 20, 2009 conduct (*i.e.*, conduct preceding the passage of the Fraud Enforcement and Recovery Act of 2009 ("FERA")) that would be actionable under a reverse-false-

claim theory. The reason for this is that a pre-FERA reverse-false claim required that the defendant make a false statement to the Government that was intended to conceal an obligation. *See, e.g.*, *United States ex rel. Barrick v. Parker-Migliorini Int'l, LLC*, 878 F.3d 1224, 1230 (10th Cir. 2017). Here, no such statement has been alleged. Therefore, to the extent that Count III is based on pre-May 20, 2009 conduct, it must be dismissed.

As for the Complaint In Intervention's post-May 20, 2009 conduct, it fares no better. As pointed out by the Clinic in its opening memorandum, the validity of the Government's reverse-false claim based on post-May 20 conduct hinges upon an "obligation" existing. An obligation can exist in at least two possible ways in a case such as this: first, under the FCA's definition of obligation, 31 U.S.C. § 3729(b)(3), and, second, under the Affordable Care Act of 2010 ("ACA"), namely, 42 U.S.C. § 1320a-7k(d). Under either Act, the Government cannot prevail.

Recently, in *United States ex rel. Barrick v. Parker-Migliorini Int'l, LLC,* the Tenth Circuit discussed the FCA's definition of obligation. 878 F.3d at 1230-33. Tellingly, the Government does not cite *Barrick* once. This is so because *Barrick* makes clear that the FCA's definition is not met here. Specifically, *Barrick* held that "a duty to pay must be formally 'established' before liability can arise," thus, "there is no liability for obligations to pay that are merely potential or contingent." *Id.* at 1231. The obligation asserted here—payment for allegedly unnecessary medical care—is the quintessential potential obligation. Only after this case is litigated, and only if the Government is able to show that Dr. Fesen's care was unnecessary, will it be established that an obligation exists. Under these circumstances, the FCA definition is of no help to the Government.

The case law and legislative history cited by the Government does not call into question the conclusion that *Barrick* mandates. Beginning with *United States ex rel. Bahrani v. Conagra, Inc.*, 465 F.3d 1189 (10th Cir. 2006), and the legislative history cited by the Government, it stands

for the simple, but unhelpful in this case, proposition that a reverse-false claim does not require the exact value of the obligation be known, but, rather, only that an obligation be formally established. Here, while it is certainly true that the value of the alleged obligation is far from clear, the Clinic's principal objection to the Government's reverse-false claim is that the alleged obligation is not established as noted above. Thus, *Bahrani* and the cited legislative history are not informative here. The same is also true for the out-of-circuit district court cases cited by the Government. (Doc. 51, pg. 25). The bottom line is that the Court is bound to the standard for obligation set forth by the Tenth Circuit, not district courts in Wisconsin and New York.

Regarding the ACA's definition for obligation, the Clinic set forth three reasons in its opening memorandum why that definition's requirements are not met here: (1) no reconciliation is alleged to have occurred, (2) the meaning of "identified" in the ACA's definition is ambiguous and the doctrines of void-for-vagueness and lenity demand the ambiguity be resolved in the Clinic's favor, and (3) the ACA is unconstitutional and unenforceable. (Doc. 42, pgs. 25-29). In its Response, the Government does not address reasons one and two for dismissal, which alone warrants a finding that the ACA definition is not satisfied in this case.

As for reason three, the Government does not challenge the Clinic's contention that the ACA is unconstitutional; in fact, it indicates the Department of Justice's position on the Act's constitutionality is consistent with the Clinic's. (Doc. 51, pg. 27). Despite this, the Government argues the ACA's definition still applies because the Act was not unconstitutional at the time the acts in question occurred. The Government's argument is not well founded. This Court must "apply the law in effect at the time it renders its decision." *Henderson v. United States*, 568 U.S. 266, 271 (2013) (discussing changes in law while a case is pending before an appellate court).

Therefore, because the ACA is, as the Government concedes, unconstitutional in its current form, its definition should not be applied here.

**IV. Counts IV and V fail to plausibly allege common law-claims.**

As stated in the Clinic's opening memorandum, the quasi-contract claims in Counts IV and V require an allegation that the parties' underlying contract is invalid. In its response, the Government argues that its common-law claims should survive because Medicare Provider Agreements are not contracts and because other district courts have allowed claims like the ones it is making to co-exist with FCA claims. (Doc. 51, pgs. 28-29). The Government's arguments fail for at least two reasons. First, contrary to its intimation that the courts are in agreement that Medicare Provider Agreements are not contracts, many courts have held that they are. *See In re Vitalsigns Homecare, Inc.*, 396 B.R. 232, 239 (Bankr. D. Mass. 2008) (stating that "a majority of bankruptcy court[s] considering the Medicare-provider relationship conclude that the Medicare provider agreement, with its attendant benefits and burdens, is an *executory contract*" (emphasis added)). Second, none of the Government's cases answers the question of how a quasi-contract claim may be brought in the face of an express contract, which is what we have here. Thus, these cases are not persuasive, and the common-law claims should be dismissed.

**CONCLUSION**

For over six years, the Government, through discovery, has had the opportunity to formulate an actionable fraud-based claim against the Clinic. Despite this time and the large amount of discovery produced by the Clinic, the Government has failed in this endeavor. The Government should not now be given yet another chance to create something that simply is not there. Accordingly, the Complaint In Intervention should be dismissed with prejudice.

Respectfully Submitted,

FOULSTON SIEFKIN LLP
1551 N. Waterfront Pkwy., Ste. 100
Wichita, KS 67206-4466

By: /s /Gary L. Ayers_
Gary L. Ayers, S. Ct. No. 10345
gayers@foulston.com
Dir. Tel.: 316.291.9530
Clayton J. Kaiser, S. Ct. No. 24066
ckaiser@foulston.com
Dir. Tel.: 316.291.9539

*Attorneys for Defendant Hutchinson Clinic, P.A.*

**CERTIFICATE OF SERVICE**

I certify that on the 10th day of June, 2019, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send email notification of electronic filing to counsel for all parties of record.

/s/ Gary L. Ayers
Gary L. Ayers